UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>JAMES J. HENDRIX,<br><br>Defendant. | CASE NO. CR19-0024JLR<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS OR FOR SANCTIONS |
|---|---|

## I.  INTRODUCTION

Before the court is Defendant James J. Hendrix's motion to dismiss counts 5, 6, and 7 and, in the alternative, to exclude evidence and provide a jury instruction for failure to preserve evidence.  (Mot. (Dkt. # 88).)  The Government filed an opposition (Resp. (Dkt. # 111)), and the court heard argument from the parties (*see* Dkt. # 120).  Mr. Hendrix also provided supplemental materials in support of his motion after oral argument.  (Supp. (Dkt. ## 122-123).)  The court has considered the parties' submissions, the argument of the parties, the relevant portions of the record, and the applicable law.

Being fully advised, the court GRANTS in part and DENIES in part Mr. Hendrix's motion.

## II.     BACKGROUND

On August 24, 2018, an officer from the Snohomish County Sheriff's Office ("SCSO") attempted to pull Mr. Hendrix over for driving a motorcycle without a helmet. (Mot. at 4-5.) When the officer attempted to stop Mr. Hendrix, however, he fled the scene on his motorcycle at a high rate of speed. (*See id.*) Moments later, Mr. Hendrix wrecked his motorcycle and was so seriously injured that he was unresponsive at the scene of the wreck. (*See id.* at 5.)

Neither the emergency personnel nor the SCSO officers on the scene knew Mr. Hendrix, so the SCSO searched his person for identification. (*See id.*; Resp., Ex. 2 at 2.) One of the officers on scene, Sergeant Sorenson, claims that he found no wallet or identification in Mr. Hendrix's pants pocket, but that he did find a "fanny pack" attached to Mr. Hendrix's waist.[1] (*See* Mot. at 5; Resp., Ex. 2 at 2.) Sergeant Sorenson further claims that he removed the fanny pack and searched it for identification. (*See* Mot. at 5; Resp., Ex. 2 at 2.) Inside the fanny pack, Sergeant Sorenson found plastic baggies of methamphetamine and heroin and two fully loaded gun magazines. (*See* Mot. at 5-6; Resp., Ex. 2 at at 2.) Sergeant Sorenson allegedly alerted the paramedics on scene about the possibility that Mr. Hendrix might have a firearm on his person and searched Mr. Hendrix's person for a gun but did not find one. (*See* Mot. at 5-6; Resp., Ex. 2 at 2.) He

---
[1] The court adopts the term "fanny pack" to maintain consistency with the parties and their arguments.

then searched the fanny pack for a gun and located one inside. (*See* Mot. at 5-6; Resp., Ex. 2 at 2.) Sergeant Sorenson then handed the fanny pack to a second officer on the scene, Deputy Dermott. (*See* Mot. at 5-6; Resp., Ex. 2 at 2; *id.*, Ex. 3 at 2-3.) Deputy Dermott also searched the fanny pack for identification but did not find any. (*See* Mot. at 5-6; Resp., Ex. 3 at 2-3.) Like Sergeant Sorenson, Deputy Dermott saw narcotics inside the fanny pack. (*See* Mot. at 5-6; Resp., Ex. 3 at 2-3.)

Mr. Hendrix was transported to Harborview Medical Center due to the severity of his injuries. (*See* Resp. at 3.) While Mr. Hendrix was at Harborview, a traffic reconstruction expert with the SCSO took photographs of the scene to reconstruct the accident. (*See id.*; *id.*, Ex. 9.) According to the Government, this officer was not a narcotics or violent crime detective; his job was to respond to traffic accidents in order to reconstruct the scene of the accident. (*See id.* at 3.)

While the traffic reconstruction detective was on the scene, Deputy Dermott took custody of the fanny pack and other personal items from the scene that did not accompany Mr. Hendrix to the hospital. (*See id.* at 3; *id.*, Ex. 3 at 2-4.) At the precinct, he searched and inventoried the items inside the fanny pack. (*See id.* at 3; *id.*, Ex. 3 at 3-4.) Inside the fanny pack, Deputy Dermott identified three baggies of narcotics that contained methamphetamine and heroin, a Glock handgun, three loaded magazines, and eight empty clear plastic baggies. (*See id.*, Ex. 3 at 3-4.) Deputy Dermott entered the narcotics, handgun, and magazines into evidence. (*See id.*, Ex. 7.) The Government claims that Deputy Dermott entered "the remaining items" into safekeeping under the label "Household Goods: Items/Property from Injured Motorcycle Rider." (*See id.* at 3;

*id.*, Ex. 7.)  The evidence receipt and the Government's briefing fail to specifically state that the fanny pack was included amongst "the remaining items" that were entered into safekeeping.  (*See id.* at 3; *id.*, Ex. 7.)  It is also not clear what happened to the eight clear plastic baggies that Deputy Dermott found inside the fanny pack.  (*See id.* at 3; *id.*, Ex. 7.)

On August 27, 2018, the SCSO sent a letter to Mr. Hendrix advising him that his personal property was available for pickup and would be destroyed within 60 days pursuant to SCSO policy if not claimed.  (*See id.*, Ex. 8.)  The Government claims that the SCSO did not treat Mr. Hendrix's case as a criminal referral until "late September 2018" due to the severity of Mr. Hendrix's injuries and the fact that he had not yet been released from Harborview.  (*See id.* at 3-4.)  Ultimately, Deputy Dermott prepared the case for criminal referral, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") eventually adopted the case for federal prosecution.  (*See id.* at 4.)  ATF Special Agent Matthew Wear handled the case for the ATF.  (*See id.*)

Mr. Hendrix was indicted on January 31, 2019.  (*See* Dkt. # 1.)  On March 6, 2019, Agent Wear collected the heroin, methamphetamine, firearm, magazines, and ammunition that had been entered in SCSO evidence.  (*See* Resp. at 4; *id.*, Ex. 10.)  Agent Wear also collected two sealed brown paper bags from safekeeping that were marked as "Household Goods:  Items/Property from Injured Motorcycle Rider," but left behind one sealed brown paper bag marked "Household Goods:  Items/Property from Injuried [sic] Motorcycle Rider."  (*See id.* at 4; *id.*, Ex. 10.)  The Government states that the contents of the bag that Agent Wear left behind are unknown, and the Government

does not explain why Agent Wear took only two out of three bags. (*See id.* at 4.) On May 12, 2019, the SCSO destroyed the remaining property in safekeeping without informing the Government. (*See id.*) The Government does not have possession of the fanny pack or the eight empty plastic baggies and no pictures were taken of the fanny pack or its contents. (*See id.*)

### III. ANALYSIS

Mr. Hendrix now alleges that counts 5-7 of the indictment—all of which relate to the August 24, 2018 arrest—should be dismissed due to the Government's destruction of the fanny pack and empty baggies, which allegedly violates Mr. Hendrix's right to due process.[2] (*See* Mot. at 1-2.) Alternatively, Mr. Hendrix seeks to exclude testimony of the SCSO officers who conducted the search of the fanny pack. (*See id.*) Finally, Mr. Hendrix requests an adverse inference instruction stating that the jury may find that, if the fanny pack and empty baggies had been preserved, it would be helpful to Mr. Hendrix. (*See id.*) Mr. Hendrix requests an evidentiary hearing to resolve any contested factual matters bearing on these issues. (*See id.*) In response, the Government claims that none of these sanctions are warranted because Mr. Hendrix has not shown that the evidence at issue would be exculpatory or that the Government acted in bad faith. (*See* Resp. at 1.)

//

---

[2] Mr. Hendrix also argues that the SCSO's failure to take photographs of the fanny pack and its contents violates due process. (*See* Mot. at 10-11.) The court rejects that argument out of hand. The court is not aware of any authority suggesting that law enforcement violates due process by failing to take all of the photographs that a defendant would prefer to have access to, and Mr. Hendrix was unable to identify any such authority in its briefing or at oral argument.

The court first considers whether Mr. Hendrix is entitled to an evidentiary hearing before moving to the merits of his motion.

**A.      Request for an Evidentiary Hearing**

As a threshold matter, the court addresses Mr. Hendrix's request for an evidentiary hearing. Generally, evidentiary hearings must be held "only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). Mr. Hendrix has not met that burden here.

The relevant factual issues for this motion center on the missing fanny pack and plastic baggies; specifically, why that evidence went missing, what its exculpatory value could have been, and whether the SCSO or the Government acted in bad faith in misplacing or destroying the evidence. The Government sets forth its explanation on those issues and provides evidence in support of that explanation in its response to Mr. Hendrix's motion. (*See generally* Resp. at 1-5.) The SCSO collected the fanny pack at the scene of Mr. Hendrix's accident, inventoried the fanny pack and items within the fanny pack at the precinct, and catalogued some of the items as "evidence" and others as "household goods." (*See id.* at 2-3.) In March 2019, Agent Wear collected all of the items marked as "evidence" and two out of three bags of "household goods." (*See id.* at 4.) After Agent Wear collected the evidence, the third bag of "household goods" was destroyed pursuant to SCSO policies. (*See id.*) The Government has confirmed that the fanny pack and empty baggies are now gone. (*See id.* at 4-5.)

//

Mr. Hendrix, on the other hand, has not alleged any facts with "sufficient definiteness, clarity, and specificity" that would enable the court to conclude that meaningful contested issues of fact exist. (*See generally* Mot. at 4-7.) Indeed, when asked at oral argument what factual disputes justified Mr. Hendrix's request for an evidentiary hearing, Mr. Hendrix responded that the defense was entitled to examine the SCSO officers in order to test their credibility. (*See* 12/4/19 Hearing.) But Mr. Hendrix offered no evidence or contrary testimony to suggest that the SCSO's or the Government's account of the incident was not credible. (*See id.*) The court finds that, absent facts or contrary testimony placing credibility at issue, Mr. Hendrix's blanket desire to test the credibility of law enforcement is little more than a fishing expedition. That is not sufficient to create a contested issue of fact that warrants an evidentiary hearing. *See Howell*, 231 F.3d at 621 (concluding that "boilerplate" and "conclusory" motion was inadequate to warrant evidentiary hearing).

Because Mr. Hendrix has not shown that there are any contested issues of fact, the court DENIES his request for an evidentiary hearing.

**B.      Due Process Claim**

The Government's failure to preserve evidence violates due process in two scenarios: (1) when the unavailable evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," *California v. Trombetta*, 467 U.S. 479, 489 (1984); and (2) where the Government's failure to preserve "potentially useful" evidence—as opposed to exculpatory evidence—

was done in bad faith, *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The court considers these issues in turn.

### 1. Exculpatory Value

Under *Trombetta*, the key question is whether an item's exculpatory value is apparent before it is lost or destroyed. *Trombetta*, 467 U.S. at 489. Evidence is exculpatory if it is "favorable to an accused" and "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Exculpatory evidence is material if its introduction at trial would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *See Comstock v. Humphries*, 786 F.3d 701, 711 (9th Cir. 2015) (citations omitted). Mere speculation regarding the exculpatory value of evidence is not sufficient to establish that the evidence is exculpatory. *See United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is not 'apparent' when the evidence merely 'could have' exculpated the defendant.").

Mr. Hendrix has made essentially no attempt to show that the lost fanny pack or baggies had "exculpatory value," let alone that the SCSO knew it was exculpatory when it destroyed the evidence. Mr. Hendrix's arguments on the exculpatory value of the lost items focuses on their relevance to the Government's case. (*See, e.g.*, Mot. at 9-10 ("The items also had an apparent exculpatory value because the government is claiming that Hendrix, by virtue of the fanny pack, was in physical possession of the drugs, the baggies, and the firearm. Physical possession is a critical element to all of the charges arising under the August incident."). The court agrees that the existence of the fanny

pack and empty baggies have at least marginal relevance to the charges filed against Mr. Hendrix. According to the Government, the fanny pack was the container carrying the narcotics and the firearm, while the empty baggies suggest that Mr. Hendrix was more than just a recreational narcotics user. But that the lost or destroyed evidence is relevant is not the question *Trombetta* and its progeny ask. Rather, the question is whether the evidence had apparent exculpatory value, *see Trombetta*, 467 U.S. at 489, and the issue with Mr. Hendrix's motion is that he cannot explain how the empty fanny pack and empty plastic baggies would do anything other than inculpate him. Outside of purely conjectural challenges to the SCSO's credibility, Mr. Hendrix does not meaningfully dispute the existence of the fanny pack or empty baggies. (*See generally* Mot.) And Mr. Hendrix did not articulate any hypothetical characteristics of the fanny pack or empty baggies that would exculpate him if he could present those characteristics to the jury. (*See generally id.*)

Because Mr. Hendrix cannot show that the fanny pack had exculpatory value, he cannot establish a due process violation under *Trombetta* and its progeny. Instead, his central argument that he is entitled to review the fanny pack and empty baggies due to their relevance to his case is more appropriately viewed under the *Youngblood* framework that the court considers below.

    2.    <u>Potentially Useful Evidence</u>

At best, Mr. Hendrix has established that the fanny pack and empty baggies were "potentially useful" evidence under *Youngblood*. "Potentially useful" evidence is "evidentiary material of which no more can be said than that it could have been subjected

to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57 (1988).  Where lost or destroyed evidence is only "potentially useful," the defendant alleging due process violations due to the loss of that evidence bears the burden to show that law enforcement acted in bad faith in losing or destroying the evidence.  *See id.* ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

       Mr. Hendrix cannot meet this burden because there is no evidence that the SCSO acted in bad faith in failing to preserve the fanny pack and empty baggies.  To the contrary, the available evidence shows that the SCSO acted in "good faith and in accord with their normal practice."  *See Youngblood*, 488 U.S. at 56 (quoting *Trombetta*, 467 U.S. at 488).  The SCSO collected the fanny pack at the scene, returned to the station, and carefully inventoried Mr. Hendrix's property.  (*See* Resp. at 2-4.)  During that process, Deputy Dermott determined that the heroin, methamphetamine, Glock handgun, magazines, and ammunition taken out of the fanny pack or off of Mr. Hendrix's person were evidence and stored them as such.  (*See id.* at 3-4; *id.* Ex. 7.)  He determined that the remaining items were personal property and entered them into safekeeping.  (*See* Resp. at 3-4; *id.* Ex. 7.)  Mr. Hendrix was then notified that he had 60 days to collect his property pursuant to SCSO policy.  (*See* Resp., Ex. 8.)  The SCSO then kept all of Mr. Hendrix's property until Agent Wear had an opportunity to review and collect that property in March 2019 and destroyed the "household goods" that Agent Wear did not collect two months later.  (*See id.* at 4; *id.*, Ex. 10.)

At most, the evidence suggests that Deputy Dermott made the wrong decision when he catalogued the fanny pack and its contents. Given the nature of the items found in the fanny pack, it would have been reasonable to suspect that Mr. Hendrix may be charged in the future with possession of narcotics with intent to distribute. In anticipation of those charges, Deputy Dermott could have catalogued the fanny pack and empty baggies as "evidence" instead of "household goods." Alternatively, Deputy Dermott could have taken pictures of the fanny pack and its contents to ensure that there were additional sources of evidence available. Still, the problem with Mr. Hendrix's due process argument is that there is no evidence that his decisions to preserve the drugs, ammunition, and firearms found inside the fanny pack and catalog everything else as personal property was made in bad faith. Bad faith, in this context, requires a showing of "official animus" or "a conscious effort to suppress exculpatory evidence." *See Trombetta*, 467 U.S. at 488. At most, the SCSO's decision not to catalog the fanny pack and empty baggies as "evidence" is evidence of a negligence, which is not enough to show bad faith. *See United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness."); *United States v. Brown*, No. 2:17-CR-58 JCM (VCF), 2018 WL 451556, at *3 (D. Nev. Jan. 16, 2018) ("A showing of negligence or recklessness is insufficient—bad faith requires something akin to a "conscious effort to suppress exculpatory evidence."); *United States v. Taylor*, 312 F. Supp. 3d 170, 179 (D.D.C. 2018) ("At most [the defendant] has shown that the investigation and documentation of what was found was incomplete. That may form a

//

basis for cross-examination of the government's witnesses, but it does not rise to the level of a due process violation.").

Thus, the court concludes that Mr. Hendrix has not met his burden to show that the SCSO or the Government acted in bad faith. Accordingly, the court DENIES Mr. Hendrix's due process challenge and his request to dismiss counts 5, 6, and 7.

**C.     Alternative Sanctions**

In the Ninth Circuit, "[t]he rule governing sanctions for lost or destroyed evidence is found in the controlling concurrence in *United States v. Loud Hawk*." *United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018) (citing *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979) (en banc) (Kennedy, J., concurring), *reversed on other grounds in United States v. W.R. Grace*, 526 F.3d 499, 506 (9th Cir. 2008)). According to *Loud Hawk*, a court's "principal concern is to provide the accused an opportunity to produce and examine all relevant evidence to insure a fair trial." *Loud Hawk*, 628 F.2d at 1152. In determining whether sanctions are necessary to protect the interests of the accused, courts must balance "the quality of the Government's conduct" against "the degree of prejudice to the accused." *Id.* In conducting that balancing test, the Government bears the burden of justifying its conduct and the accused of demonstrating prejudice. *Id.* Sanctions against the Government, including suppression of evidence, may be imposed even in the absence of bad faith or a constitutional violation. *See United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (citing *Loud Hawk*, 628 F.2d at 1152).

Here, the court is somewhat troubled by the quality of the Government's conduct. In assessing the "quality" of the Government's actions, courts "consider whether the

evidence was lost or destroyed while in the government's custody, whether the government acted in disregard of the defendant's interests, whether the government was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification." *Robertson*, 895 F.3d at 1213 (citing *Loud Hawk*, 628 F.2d at 1152). As noted above, the fanny pack and empty baggies are relevant to this case, *see supra* § III.B.1, and the relevance of those items probably should have been clear to the SCSO, *see supra* § III.B.2. Moreover, although the Government does not appear to know exactly what happened to the fanny pack and empty baggies, there is no dispute that the SCSO had possession of those items during inventory and that they are now gone. (*See* Resp. at 3; *id.*, Ex. 3 at 3-4.) And the Government cannot point the finger entirely at the SCSO. Mr. Hendrix was indicted on January 31, 2019, and no evidence from SCSO was destroyed until May 12, 2019 (*see id.* at 4), leaving the Government with more than five months to collect and preserve this evidence. Moreover, Agent Wear had an opportunity to collect the evidence at the SCSO and chose to collect two out of three bags of "household goods." (*See id.*) Yet, the Government still did not retain the fanny pack or empty baggies. Taken together, this evidence shows that the evidence was lost on the Government's watch and that the SCSO and the Government were arguably negligent in conducting their investigations.

That said, the remaining factors identified in *Robertson* weigh in the Government's favor. The prosecuting attorneys responsible for this case do not appear to have been involved in the loss of the evidence; there is no evidence that the Government

or the SCSO was acting in "disregard of" Mr. Hendrix's interests; and, as noted above, the loss of evidence was not deliberate and appears to have been a result of standard SCSO practices for destroying personal property kept in safekeeping, *see supra* § III.B.2. Thus, the analysis on the "quality" of the Government's actions is relatively neutral.

With respect to "the degree of prejudice" to Mr. Hendrix, courts consider "the centrality and importance of the lost evidence to the case, the probative value and reliability of secondary or substitute evidence, the nature and probable weight of inferences and kinds of proof lost to the accused, and the probable effect on the jury from the absence of the evidence." *Robertson*, 895 F.3d at 1214 (citing *Loud Hawk*, 628 F.2d at 1152). The court has already touched on many of these factors. *See supra* § III.B.1. As Mr. Hendrix notes, due to the absence of photographs, the only secondary evidence available is the SCSO officers and their reports, which effectively positions the fox to guard the hen house. That said, Mr. Hendrix has not been able to point to any evidence to suggest that the SCSO's accounts of the fanny pack and its contents are anything less than truthful. *See supra* § III.A. As far as the character of the lost evidence, the court has already noted that the empty fanny pack and empty baggies are relevant to this case but not crucial or exculpatory. It is also not clear to the court what Mr. Hendrix would have been able to prove had the fanny pack and empty baggies been available to him. In fact, the loss of those items is likely more detrimental to the Government than Mr. Hendrix. Ultimately, the court finds that Mr. Hendrix suffered a fairly low degree of prejudice, if any, as a result of the lost evidence.

//

Accordingly, given that the Government's conduct falls well short of egregious and Mr. Hendrix has not been significantly prejudiced, the court will not exclude the testimony of the officers who searched the fanny pack. Instead, the court believes that the appropriate remedy under the circumstances is to allow the parties to present this evidence to the jury and allow the jury to conclude what weight, if any, to give to the fact that the Government or the SCSO lost the fanny pack and the empty baggies. In order to assist the jury in making that determination, the court finds that a jury instruction modeled after Ninth Circuit Model Criminal Jury Instruction 4.19 is warranted:

> **4.19 LOST OR DESTROYED EVIDENCE**
>
> If you find that the government intentionally [destroyed][failed to preserve] [*insert description of evidence*] that the government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the government.

Thus, the court GRANTS in part and DENIES in part Mr. Hendrix's request for sanctions. The court will not exclude any evidence as a result of the loss of the fanny pack and the empty baggies, but the court will provide a jury instruction on the lost evidence.

## IV. CONCLUSION

For the reasons set forth above, Mr. Hendrix's motion to dismiss counts 5, 6, and 7 and, in the alternative, to exclude evidence and provide jury a instruction for failure to preserve evidence (Dkt. # 88.) is GRANTED in part and DENIED in part. Mr. Hendrix's requests to dismiss counts 5, 6, and 7 and to exclude evidence are DENIED, but his request for a jury instruction for failure to preserve evidence is GRANTED. The court

further ORDERS the parties to file proposed joint or disputed instructions modeled after Ninth Circuit Model Criminal Jury Instruction 4.19 for the court's review by Tuesday, December 10, 2019.

Dated this 6th day of December, 2019.

*[signature]*

JAMES L. ROBART
United States District Judge