UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>JAMES J. HENDRIX,<br><br>Defendant. | CASE NO. CR19-0024JLR<br><br>ORDER GRANTING MOTION TO EXCLUDE TESTIMONY |

## I.  INTRODUCTION

Before the court is Plaintiff United States of America's ("the Government") motion to exclude Professor Simon Cole's testimony at trial.  (Mot. (Dkt. # 142); *see also* Reply (Dkt. # 163).)  Defendant James J. Hendrix filed an opposition to the Government's motion and an affidavit from Professor Cole.  (Resp. (Dkt. # 155)).  Additionally, the court heard testimony from Professor Cole at the December 6, 2019,

//

//

*Daubert*[1] hearing on the proposed testimony from the Government's fingerprint examiner, Kristi Riccobuono. (*See* 12/6/19 Hearing Transcript (Dkt. # 156).) The court has considered the parties' submissions, the testimony of Professor Cole, the relevant portions of the record, and the applicable law. Being fully advised, the court GRANTS the Government's motion and excludes Professor Cole from testifying at the trial.[2]

## II.  BACKGROUND

### A.  The Government's Fingerprint Analysis

On June 21, 2018, officers from the Seattle Police Department ("SPD") arrested Mr. Hendrix in the parking lot of an auto repair shop. (*See* Def. Tr. Br. (Dkt. # 128) at 2.) SPD officers found Mr. Hendrix standing next to the open driver's door of a U-Haul truck. (*See id.*) After the officers located a shotgun under the driver's seat of the U-Haul, they arrested Mr. Hendrix. (*See id.* at 2-3.) SPD impounded the U-Haul and obtained a warrant to search it. (*See* Gov't Tr. Br. (Dkt. # 106) at 6.) SPD latent print examiner Kristi Riccobuono conducted latent fingerprint analyses on a number of items found within the U-Haul. (*See* Riccobuono Rept. (Dkt. # 90-1) at 1.) Ms. Riccobuono concluded that a fingerprint on one of the firearm magazines found within the U-Haul "was identified to the left index finger of James Joseph Hendrix." (*See id.* at 3.)

//

---

[1] *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).
[2] The court orally granted the Government's motion to exclude Professor Cole before *voir dire* on December 16, 2019. (*See* 12/16/19 Minute Entry (Dkt. # 174).) During that hearing, the court informed the parties that it would file written order memorializing that ruling. (*See id.*)

**B.     Ms. Riccobuono's *Daubert* Hearing**

On November 21, 2019, the Government disclosed its intent to call Ms. Riccobuono to testify about the results of her analysis at Mr. Hendrix's trial. (Gov't Disc. (Dkt. # 90-3) at 3.) Mr. Hendrix moved to exclude Ms. Riccobuono, and the court held a *Daubert* hearing to determine whether her proposed testimony was admissible. (*See* Mot. to Exclude Riccobuono (Dkt. # 78); 12/6/19 Hearing Transcript.) Professor Cole, Mr. Hendrix's proposed expert, appeared and testified at that hearing. (*See* 12/6/19 Hearing Transcript at 31-48.)

At Ms. Riccobuono's *Daubert* hearing, Ms. Riccobuono explained that she used the ACE-V methodology to examine the fingerprint taken off the magazine. (*See id.* at 12:3-13:19; 18:20-24.) Ms. Riccobuono described the ACE-V methodology in detail and testified that ACE-V is generally accepted in the scientific community, peer-reviewed, researched, the subject of publications, repeatable, and "considered a best practice among fingerprint examiners." (*See generally id.* at 8-19.) Based on her application of the ACE-V methodology, Ms. Riccobuono concluded that there was "identification" to Mr. Hendrix for the fingerprint taken off the magazine. (*See id.* at 18:20-24.) According to Ms. Riccobuono, "identification" does not mean that her conclusion is subject to a "zero error rate or what could be described as infallibility." (*See id.* at 19:18-20.) Instead, "identification" means that "when you have the prints side by side, the available information within those prints are in agreement to determine that they are from the same source." (*See id.* at 19:10-17.)

On cross-examination, Mr. Hendrix's counsel asked Ms. Riccobuono about the error rates in two specific latent print examination studies. (*See id.* at 20:18-22:2.) Although Ms. Riccobuono was not able to recall the exact error rates from those studies, she testified that she was familiar with those studies and was able to provide testimony about them. (*See id.*) Ms. Riccobuono also testified that she had some familiarity with a report from the President's Council of Advisors on Science and Technology ("PCAST") on latent print analysis. (*See id.* at 25:2-7.)

After Ms. Riccobuono concluded her testimony, Professor Cole testified. (*See generally id.* at 31-48.) Professor Cole is not a fingerprint examiner. (*See id.* at 37:17-19.) As such, he readily acknowledged that he "is not qualified to give an opinion on the source of a latent print." (*See id.* at 37:22-25.) Instead, Professor Cole's knowledge of fingerprint analysis is derived from professional literature. (*See id.* at 38:1-4.) He has a Ph.D. from Cornell University in Science and Technology Studies, which is "a field of social science that tries to understand the making of scientific knowledge." (*See id.* at 31:24-32:4.) He testified that he teaches courses on "forensic science, law, and society," "miscarriages of justice," "the death penalty" and "surveillance in society." (*See id.* at 42:19-22.) Professor Cole has also published books on the history of fingerprint identification and a number of academic articles in his field. (*See id.* at 32:8-11; *see also* Cole *Curriculum Vitae* (Dkt. # 125-1).)

Professor Cole's direct examination focused almost entirely on the PCAST report. According to Professor Cole, the PCAST report "concluded that it would be okay to use latent print analysis in court . . . subject to a number of caveats." (*See id.* at 33:24-34:4.)

Specifically, Professor Cole testified that the PCAST report recommended that the fact-finder receive certain information about the error rate for latent print analysis and the studies that had been done on error rates for latent print analysis, and that certain "anti-bias" measures should be used in conducting latent fingerprint analysis. (*See id.* at 34:5-19.) Professor Cole concluded that he "agree[s] with the approach taken by PCAST, which is that [fingerprint testimony] is admissible subject to these caveats, and these caveats do not all appear to have been met in this case." (*See id.* at 36:9-15.) Professor Cole did not specify which caveats, in particular, Ms. Riccobuono's testimony failed to satisfy. (*See generally id.*)

After Ms. Riccobuono and Professor Cole testified, the court heard argument from counsel for both parties as to the admissibility of Ms. Riccobuono's testimony under *Daubert*. (*See id.* at 51-58.) Instead of attacking the relevance and reliability of Ms. Riccobuono's testimony, however, Mr. Hendrix's counsel focused much of his argument on Mr. Hendrix's "alternative" request to excluding Ms. Riccobuono—allowing Professor Cole to testify as a rebuttal expert about the PCAST report. (*See id.* at 51:6-12.) Mr. Hendrix's counsel argued that he felt it was important to "get the error rates to the jury" from the PCAST report and other studies referenced in that report, and that his preference would be to have Professor Cole "synthesize" that information for the jury. (*See id.* at 52:7-23.)

The court orally denied the motion to exclude Ms. Riccobuono. (*See id.* at 59:11-63:19.) The court found that Ms. Riccobuono was qualified to testify under Federal Rule of Evidence 702 and that her testimony was both relevant and reliable. (*See*

*id.*) In so ruling, the court specifically rejected Professor Cole's conclusion that the methodology that Ms. Riccobuono used was unreliable. (*See id.* at 60:12-61:4.)

**C.     Professor Cole's Proposed Testimony**

The subject of the current motion is the admissibility of Professor Cole's proposed testimony as a rebuttal witness to Ms. Riccobuono. In his opposition to the Government's motion to exclude Professor Cole, Mr. Hendrix confirmed that he seeks to offer Professor Cole as a "rebuttal witness" to testify on the following topics:

> all evidence, and all science, is probabilistic in nature; it is not scientifically acceptable for a science to say "we don't use probability"; all evidence is subject to error rates; error rates from the two accuracy studies submitted by the government in their response to the *Daubert* motion; the claim that the defendant is the source is not scientifically acceptable and increasingly not accepted within the latent print discipline itself.

(*See* Resp. at 2-3.) Professor Cole also submitted an affidavit in support of Mr. Hendrix's opposition to the motion to exclude that provided additional "bases and reasons for [Professor Cole's] opinion." (*See id.* at 4 (citing Cole Aff. (Dkt. # 155-3).) After the Government filed a reply in support of its motion to exclude Professor Cole (*see* Reply), Mr. Hendrix attempted to submit a supplemental affidavit from Professor Cole in order to "respond to any inaccuracies or misunderstandings" in the Government's reply brief (*see* 2d. Cole Aff. (Dkt. # 172-1)), but the court rejected that affidavit as an improper surreply (*see* 12/16/19 Minute Entry (Dkt. # 174)).

### III.     ANALYSIS

Although the Government articulated a number of complaints with the adequacy of Professor Cole's expert disclosure under Rule 16 (*see* Mot. at 2-3), the Government

clarified on reply that it seeks to exclude Professor Cole under Rule 702 and *Daubert* (*see* Reply at 1). Thus, the court first sets forth the relevant legal standards under Rule 702 and *Daubert* before turning to the merits of the Government's motion.

A. **Legal Standard**

"Before admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Federal Rule of Evidence 702."[3] *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. at 597). "Relevancy simply requires that 'the evidence logically advance a material aspect of the party's case.'" *Id.* (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citation and internal alterations omitted)). Reliability "requires that the expert's testimony have 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). The reliability analysis is "a malleable one tied to the facts of each case," and "district courts are vested with 'broad latitude' to 'decide how to test an expert's reliability' and

---

[3] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

'whether or not an expert's relevant testimony is reliable.'" *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922-23 (9th Cir. 2017) (quoting *Kumho Tire*, 526 U.S. at 152-53).

Although *Daubert*, identifies several factors that may be used for evaluating the reliability of an expert—whether the scientific theory or technique has been tested, peer reviewed, identified as having a particular rate of error, and generally accepted in the scientific community, 509 U.S. at 592-94—district courts are not required to consider all (or even any) of these factors, nor are they required to hold a "*Daubert* hearing," *Barabin*, 740 F.3d at 463-64. In fact, where the expert's testimony is based on specialized knowledge, as opposed to specific scientific testing, "[t]he *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable" instead, the reliability of this type of testimony "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

**B.     Application to Professor Cole**

Professor Cole seeks to offer testimony on three topics: (1) scientific probability; (2) error rates in specific fingerprinting studies; and (3) whether Ms. Riccobuono's conclusion is "scientifically acceptable" and "accepted within the latent print discipline." (*See* Resp. at 2-3.) The court addresses the admissibility of each of these categories of conclusions in turn.

   1.   Scientific Probability

Professor Cole's first three opinions are broad-sweeping conclusions about scientific probability: "all evidence, and all science, is probabilistic in nature; it is not

scientifically acceptable for a science to say 'we don't use probability'; [and] all evidence is subject to error rates." (*See id.*) As an initial matter, to the extent that Mr. Hendrix asserts that Professor Cole is an expert in "all science" and "all evidence" who can opine on what is or is not "scientifically acceptable" for any particular science to say, the court rejects that contention. Based on Professor Cole's *curriculum vitae*, the court has little doubt that Professor Cole is a well-qualified academic and scholar in the field of Science and Technology Studies. (*See* Cole *Curriculum Vitae*.) But Professor Cole cannot reliably testify as an expert on "all science" and "all evidence." Professor Cole lacks the expertise necessary under Rule 702 to offer such sweeping opinions, and even if he was qualified to reliably offer such broad opinions, those opinions would not be relevant to this case or helpful to the jury because Ms. Riccobuono is not offering opinions about "all science" or "all evidence"—she is testifying about latent fingerprint identification.

Even if Professor Cole's proposed testimony about scientific probabilities was more limited to scientific probability as it applies to latent fingerprint analysis, the court would still exclude that testimony on the grounds that Professor Cole is not rebutting Ms. Riccobuono's testimony. At Ms. Riccobuono's *Daubert* hearing, Mr. Hendrix's counsel asked Ms. Riccobuono to estimate the likelihood that her conclusion was incorrect: "What is the probability that Mr. Hendrix is not the source of this identification?" (*See id.* at 20:3-7.) In response, Ms. Riccobuono responded that "[w]e don't deal with probabilities in our office. That's not an accepted standard amongst the field to deal with probabilities." (*See id.*) Based on that answer, Mr. Hendrix argues that he should be able to offer Professor Cole to rebut that opinion and testify that "all evidence, and all science,

is probabilistic in nature;" that "it is not scientifically acceptable for a science to say 'we don't use probability;'" and that "all evidence is subject to error rates." (*See* Resp. at 2-3.)

Mr. Hendrix and Professor Cole cherry-pick from Ms. Riccobuono's testimony in order to try to frame Professor Cole as a rebuttal expert. The fact that Ms. Riccobuono was unable and unwilling to speak about error rates in terms of "probability" or place a "low, medium, or high" probability threshold on the accuracy of her conclusion does not mean that she rejected the notion that her results were subject to an error rate. (*See* 12/6/19 Hearing Transcript at 20:3-10.) To the contrary, Ms. Riccobuono testified that her conclusions are not subject to "a zero error rate, or what could be described as infallibility" (*see id.* at 19:18-20), because testifying to a zero error rate or offering conclusions that identification is to "the exclusion of all others" is not a best practice amongst latent fingerprint examiners (*see id.* at 8:19-9:4). In other words, Ms. Riccobuono openly agreed that there is at least some likelihood that she erred in her analysis, but she rejected counsel's attempt to articulate that likelihood in terms of "probabilities." Thus, the problem with Professor Cole's proposed rebuttal testimony regarding probability and error rates is that it is not rebuttal testimony; Ms. Riccobuono agrees with Professor Cole that her conclusion is subject to error rates, not infallible, and not an "exclusion of all others." (*See* 12/6/19 Hearing Transcript at 8:19-9:4; 19:18-20.) Thus, the court excludes Professor Cole's proposed rebuttal opinions on scientific probability on the grounds that it would not assist the jury to hear Professor Cole rebut testimony that Ms. Riccobuono does not offer. *See United States v. Pitts*, No. 16-CR-

550 (DLI), 2018 WL 1169139, at *3 (E.D.N.Y. Mar. 2, 2018) (ruling that because "Defendant seeks to admit [Professor] Cole's testimony for the sole purpose of rebutting testimony the government does not seek to elicit . . . , [Professor] Cole's testimony will not assist the trier of fact to understand the evidence or determine a fact in issue").

2. Error Rate Studies

The court also excludes Professor Cole's proposed rebuttal testimony regarding "error rates from the two accuracy studies submitted by the government in their response to the *Daubert* motion." (*See* Resp. at 2-3.) The main issue with this testimony is that Professor Cole would act as little more than a conduit for hearsay if the court admitted this testimony. *See e.g.*, *Williams v. Illinois*, 567 U.S. 50, 80 (2012) ("[T]rial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'"). Professor Cole is a social scientist, not a fingerprint examiner. (*See* 12/6/19 Hearing Transcript at 37:17-25.) He is not qualified to apply the findings of fingerprint studies to Ms. Riccobuono's latent fingerprint analysis. Indeed, Mr. Hendrix's disclosure acknowledges that the only thing Professor Cole intends to do is inform the jury of the "error rates from the two accuracy studies submitted by the government" (*see* Resp. at 2-3), and at Ms. Riccobuono's *Daubert* hearing, Mr. Hendrix's counsel confirmed that Mr. Hendrix wanted to offer Professor Cole to "synthesize" the error rate information from various academic studies and the PCAST report for the jury (*see* 12/6/19 Hearing Transcript at 52:7-23). In other words, Professor

Cole would testify that he has read studies on latent fingerprint analysis and, in those studies, the authors found certain error rates. That is not an expert opinion; that is hearsay. *See United States v. Cantoni*, No. 18-CR-562 (ENV), 2019 WL 1259630, at *4 (E.D.N.Y. Mar. 19, 2019) (finding that "to the extent that [Professor] Cole merely plans to convey the contents of studies he did not conduct, he is poised to act as a conduit for hearsay, which is a prohibited role for an expert"). Moreover, because Professor Cole lacks the expertise to apply the results of these general studies on latent fingerprint analysis to the specific analysis that Ms. Riccobuono performed, his testimony about error rates would be confusing to the jury. Thus, the court excludes this testimony.

Additionally, as the court informed Mr. Hendrix's counsel during trial, Mr. Hendrix was free to elicit testimony about the academic studies, the PCAST report, and the state of fingerprinting science through cross-examination of Ms. Riccobuono. At her *Daubert* hearing, Mr. Hendrix's counsel examined Ms. Riccobuono on a number of different latent fingerprint studies and on the PCAST report. (12/6/19 Hearing Transcript at 20:14-22:2, 25:2-7.) Ms. Riccobuono was familiar those studies and able to answer questions about how they applied to the analysis she performed. (*See id.*) The court's decision to preclude Professor Cole from testifying about these studies has no impact on Mr. Hendrix's ability to cross examine Ms. Riccobuono on any relevant and admissible information that bears on the reliability of her conclusions. *See Pitts*, No. 2018 WL 1169139 at *3 (noting that excluding Professor Cole's testimony "in no way deprives Defendant of the right to cross-examine the government's experts on error rates and the reliability of fingerprint analysis using any evidence that is admissible at trial").

### 3. Whether Ms. Riccobuono's Conclusion is "Scientifically Acceptable"

Professor Cole's final proposed opinion is that two separate disciplines take issue with Ms. Riccobuono's conclusion that Mr. Hendrix "is the source" of the latent fingerprint at issue: the "scientific community" and the "latent fingerprint discipline." (*See* Cole Aff. ¶¶ 3-10.) More specifically, Professor Cole opines that Ms. Riccobuono's conclusion "is not scientifically acceptable" to the scientific community and is "increasingly not accepted by the latent print discipline itself." This testimony is also not admissible.

First, although Professor Cole has broad-based academic credentials in the social science field of Science and Technology, he lacks the foundational qualifications to reliably testify specifically about what is or is not "accepted within the latent print discipline" because he is not a member of that discipline. *See Ruvalcaba-Garcia*, 923 F.3d at 1188 (noting that reliability under *Daubert* "requires that the expert's testimony have 'a reliable basis in the knowledge and experience of the relevant discipline'" (quoting *Kumho Tire*, 526 U.S. at 149)). Professor Cole is not a fingerprint examiner, he has no training in fingerprint examination, and he readily acknowledges that he "is not qualified to give an opinion on the source of a latent print." (12/6/19 Hearing Transcript at 37:17-25.) The court will not allow Professor Cole to testify about what is or is not acceptable to the latent fingerprinting discipline when he is not a qualified member of that community.

Additionally, Professor Cole's testimony about the opinions of the "scientific community" and the "latent print discipline" suffer from the same problems that his

testimony about error rates suffer from—his opinions are not helpful to the jury and are overly reliant on hearsay. Professor Cole's affidavit makes clear that his testimony would consist entirely of relaying hearsay from sources he has read about latent fingerprint analysis generally and the best practices for presenting latent fingerprint testimony in court. (*See id.* ¶¶ 3-10.) Absent specific application to the fingerprint analysis that Ms. Riccobuono performed, this testimony is not helpful to the jury. Moreover, because Professor Cole has not done his own analysis and does not intend to critique Ms. Riccobuono's testimony, the court is concerned that he would act as little more than a conduit for hearsay. Experts may certainly rely on hearsay and relay it to the jury under appropriate circumstances, but experts must do more than merely repeat the conclusions of other experts. *Cf. United States v. Pritchard*, 692 F. App'x 349, 351 (9th Cir. 2017) (rejecting argument that DNA expert was a "conduit for hearsay evidence" because the expert "did not simply report the conclusions of other scientists; rather, she 'appli[ed] [her] training and experience to the sources before [her] and reach[ed] an independent judgment'" (quoting *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013))).

Finally, the court finds that Professor Cole's proposed testimony is not proper rebuttal testimony. A number of the sources Professor Cole seeks to testify about provide recommendations on how latent fingerprint examiners should present and qualify their testimony. (*See id.* at ¶¶ 4-8.) Even if that testimony were otherwise admissible, the court notes that Ms. Riccobuono's testimony is in accord with many of these recommendations. At her *Daubert* hearing, Ms. Riccobuono openly acknowledged that

her conclusion of "identification" is not an "exclusion to all others" (*see* 12/6/19 Hearing Transcript at 8:19-9:4), and that her analysis is not subject to a "zero error rate or what could be described as infallibility" (*see id.* at 19:18-20). These qualifications are consistent with many of the recommendations made by the authors of the studies Professor Cole cites in his affidavit. (*See* Cole Aff. ¶¶ 4-8.) The court will not allow Professor Cole to "rebut" Ms. Riccobuono's testimony by echoing and amplifying the portions of her conclusions with which he agrees.

Ultimately, Professor Cole's affidavit makes clear that he intends to inform the jury that Ms. Riccobuono exaggerates the reliability of her fingerprint analysis. (*See id.* at ¶¶ 3-10.) But Professor Cole is not a fingerprint examiner; he cannot review, critique, or otherwise apply his general academic knowledge to the specific fingerprint analysis Ms. Riccobuono performed; his opinion is based almost entirely on hearsay; and, ironically, by overlooking the qualifications Ms. Riccobuono places on her own fingerprint analysis, he exaggerates the extent to which Ms. Riccobuono states the reliability of her conclusions in order to try to frame his testimony as appropriate rebuttal testimony. Thus, the court concludes that this category of Professor Cole's proposed testimony is inadmissible and must be excluded from trial.

//

//

//

//

//

## IV. CONCLUSION

Because the court has concluded that none of the opinions that Professor Cole seeks to offer at trial are admissible, the Government's motion to exclude Professor Cole (Dkt. # 142) is GRANTED.

Dated this 2nd day of January, 2020.

JAMES L. ROBART
United States District Judge