UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR19-0024JLR |
| Plaintiff, | ORDER ON MOTION TO DISMISS |
| v. | |
| JAMES J. HENDRIX, | |
| Defendant. | |

## I.    INTRODUCTION

On December 16, 2019, the court commenced a two-part jury trial on seven criminal counts filed by Plaintiff United States of America ("the Government") against Defendant James J. Hendrix.  (See 12/16/19 Dkt. Entry (Dkt. # 174); Sup. Indictment (Dkt. # 69).)  The first part of the trial resulted in a partial verdict and a declaration of a mistrial.  (*See* Jury Verdict (Dkt. # 200).)  On January 16, 2020, in response to a filing from the Government styled as a "Notice Regarding Retrial" (*see* Not. (Dkt. # 212)), the court scheduled this case for a retrial on February 3, 2020 (*see* 1/16/20 Dkt. Entry).  The

court also ordered the parties to submit briefing on retrial issues raised in the Government's notice. (*See* 1/13/20 Order (Dkt. # 213).) Mr. Hendrix filed a response to the notice (Resp. (Dkt. # 216)), the Government filed a reply memorandum (Reply (Dkt. # 218)), and Mr. Hendrix filed a surreply with permission from the court. (Surreply (Dkt. # 221); 1/21/20 Order (Dkt. # 223) (granting leave to file surreply)).

The court held a pretrial conference with the parties to prepare for trial and to discuss the issues raised in the parties' briefing on January 24, 2020. (*See* 1/24/20 Dkt. Entry (Dkt. # 235).) Although neither party styled any of their filings as a motion, the parties agreed during argument that the issues presented in the Government's notice had been fully briefed and the court should construe the briefing as a motion to dismiss filed by Mr. Hendrix. (*See id.*) After hearing argument on the issues, the court informed the parties that it intended to issue a written order denying Mr. Hendrix's motion to dismiss. (*See id.*) The court provided this oral ruling so that the parties would be able to prepare for trial, which the court advised would continue as scheduled. (*See id.*) In response to this ruling, Mr. Hendrix informed the court that he intended to file an interlocutory appeal once the court issued its written ruling. (*See id.*)

With that background in mind, the court turns to the issues raised in the Government's notice and Mr. Hendrix's response (*see* Not.; Resp.), which the court construes as a motion to dismiss by Mr. Hendrix per the request of the parties. The court has considered the motion, the parties' submissions concerning the motion, the parties' oral argument, the relevant portions of the record, and the applicable law. Being fully advised, the court DENIES Mr. Hendrix's motion to dismiss.

## II.    BACKGROUND

**A.    The Superseding Indictment**

The seven counts in the superseding indictment pertain to events that took place on two dates—June 21, 2018, and August 24, 2018.  (*See* Sup. Indictment.)  Although the court will not recap all of the evidence elicited at trial or the parties' arguments about the evidence, the court briefly addresses the relevant events in order to place the counts in the superseding indictment in the proper context.[1]

Counts 1-4 in the superseding indictment relate to events that occurred on June 21, 2018.  The evidence at trial showed that, on that date, officers from the Seattle Police Department ("SPD") arrested Mr. Hendrix in the parking lot of an auto repair shop in Seattle, Washington.  SPD officers found Mr. Hendrix on scene standing next to the open driver's side door of a U-Haul.  After securing Mr. Hendrix, the officers swept the parking lot and found a firearm on the bumper of a truck parked next to the U-Haul and a shotgun under the driver's seat of the U-Haul.  Once the officers found the shotgun, they arrested Mr. Hendrix.  During a search incident to arrest, the SPD found 8.8 grams of methamphetamine and 21.2 grams of heroin on Mr. Hendrix's person.  The SPD impounded the U-Haul and obtained a warrant to search it.  During that search, the SPD found a third firearm, a bag containing 271.3 grams of methamphetamine, a loaded handgun magazine, and a number of other items of interest inside the cab of the U-Haul.

---

[1] The parties' trial briefs also contain concise recaps of the relevant events of June 21, 2018, and August 24, 2018.  (*See* Gov't Trial Br. (Dkt. # 106); Def. 1st Trial Br. (Dkt. # 128); Def. 2d Trial Br. (Dkt. # 131).)

Count 1 of the superseding indictment charges Mr. Hendrix with felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922 based on the three firearms and the loaded magazine found on the scene.  (*See* Sup. Indictment at 1-2; Gov't Trial Br. at 1-2.)  Count 2 charges Mr. Hendrix with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 based on the 271.3 grams of methamphetamine found inside the U-Haul.  (*See* Sup. Indictment at 2; Gov't Trial Br. at 2.)  Count 3 charges Mr. Hendrix with possession of methamphetamine and heroin with intent to distribute in violation of 21 U.S.C. § 841 based on the 8.8 grams of methamphetamine and 21.2 grams of heroin found on Mr. Hendrix's person.  (*See* Sup. Indictment at 2-3; Gov't Trial Br. at 2.)  Count 4 charges Mr. Hendrix with possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 based on the three firearms found on scene and the drug trafficking crimes charged in Counts 2 and 3.  (*See* Sup. Indictment at 3; Gov't Trial Br. at 2.)

Counts 5-7 relate to events that occurred on August 24, 2018.  The evidence at trial showed that, on that date, an officer from the Snohomish County Sheriff's Office ("SCSO") attempted to pull Mr. Hendrix over for driving a motorcycle without a helmet. When the officer attempted to stop Mr. Hendrix, however, he fled the scene on his motorcycle.  Moments later, Mr. Hendrix wrecked his motorcycle and was so seriously injured that he was unresponsive at the scene of the wreck.  The SCSO officers on the scene searched a bag attached to Mr. Hendrix's person for identification but instead found a firearm, 8 grams of methamphetamine, and 3.3 grams of heroin inside the bag.

//

Count 5 of the superseding indictment charges Mr. Hendrix with felon in possession of a firearm in violation of 18 U.S.C. § 922 based on the firearm found inside the bag. (*See* Sup. Indictment at 2-3; Gov't Trial Br. at 2.) Count 6 charges Mr. Hendrix with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841 based on the 8 grams of methamphetamine found inside the bag. (*See* Sup. Indictment at 4; Gov't Trial Br. at 2.) Count 7 charges Mr. Hendrix with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 based on the firearm found inside the bag and the drug trafficking crime charged in Count 6. (*See* Sup. Indictment at 4-5; Gov't Trial Br. at 2.)

Before trial, Mr. Hendrix moved to bifurcate the two counts for felon in possession of a firearm—Counts 1 and 5—and the court granted that request after the Government stated that it did not object. (*See* Mot. to Bifurcate (Dkt. # 77); Resp. to Mot. to Bifurcate (Dkt. # 85) at 18; 12/4/19 Dkt. Entry (Dkt. # 120).) Accordingly, Mr. Hendrix's trial proceeded in two phases, with Counts 2-4 and 6-7 tried first and Counts 1-5 tried after the jury's verdict on the Counts 2-4 and 6-7. For purposes of this motion, only the first phase of the trial and the jury's verdict on Counts 2-4 and 6-7 are at issue. (*See generally* Not.; Resp.)

**B.    Lesser Included Offenses**

Although the superseding indictment does not charge Mr. Hendrix with any counts of possession of controlled substances, Mr. Hendrix requested that the court instruct the jury that the Government's charges of possession of controlled substances with intent to distribute in Counts 2, 3, and 6 include the lesser crime of possession of controlled

substances. (*See* Def. Jury Instr. (Dkt. # 129) at 39, 53.) Specifically, Mr. Hendrix requested that the court instruct the jury that "[i]f (1) any of you are not convinced beyond a reasonable doubt that the defendant is guilty of possession with intent to distribute; and (2) all of you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime of possessing controlled substances," then the jury may find the defendant guilty of the lesser crime of possession of controlled substances. (*See id.*)

The court concluded that Mr. Hendrix was entitled to lesser included offense instructions for Count 3 related to the 8.8 grams of methamphetamine and 21.2 grams of heroin found on Mr. Hendrix's person on June 21, 2018, and for Count 6 related to the 8 grams of methamphetamine found inside the bag on August 24, 2018, but not for Count 2 related to 271.3 grams of methamphetamine found inside the U-Haul. (*See* Final Jury Instr. (Dkt. # 190) at 22, 25.) Thus, for Counts 3 and 6, the court instructed the jury on the lesser offenses of possession of controlled substances and included the specific language that Mr. Hendrix requested that informed the jury that they could convict on the lesser included offense if "any of you are not convinced beyond a reasonable doubt that the defendant is guilty of possession with intent to distribute." (*See id.*)

With input from the parties, the court prepared a verdict form that provided the jury with an option to convict on the lesser included offenses for Counts 3 and 6. (*See* Jury Verdict at 3, 6.[2]) For those counts, the first question on the verdict form (*i.e.*,

_____

[2] As the verdict form shows, the question numbers in the verdict form do not align with the count numbers charged in the superseding indictment. (*Compare* Jury Verdict *with* Sup. Indictment.) As noted above, trial in this case was bifurcated so that the felon in possession of firearms counts could be tried separately from the other five counts. (*See* 12/4/19 Dkt. Entry.)

Question 2 and Question 4) asks the jury to determine whether Mr. Hendrix was "GUILTY" or "NOT GUILTY" on the greater offenses of possession with intent to distribute. (*See id.* at 2, 5.) Immediately below the question that pertains to the greater offense, the form then instructs the jury that "[i]f you find the defendant not guilty of this charge, skip Question 2A and proceed to Question 2B below. If you find the defendant guilty as charged, proceed to Question 2A below." (*See id.* at 3; *id.* at 6 ("If you find the defendant not guilty of this charge, skip Question 4A and proceed to Question 4B below. If you find the defendant guilty as charged, proceed to Question 4A below.").) Questions 2A and 4A ask the jury what quantity and type of narcotics Mr. Hendrix possessed with intent to distribute in the event that the jury finds him guilty of the greater offenses; Questions 2B and 4B ask the jury to find Mr. Hendrix "GUILTY" or "NOT GUILTY" on the lesser included offenses in the event that the jury finds Mr. Hendrix not guilty of the greater offenses. (*See id.* at 3, 6.) The instructions provided before Questions 2B and 4B instructed the jury to skip the questions on the lesser included offenses "[i]f you find the defendant guilty" of the greater offenses and to answer Questions 2B and 4B "[i]f you find the defendant not guilty" of the greater offenses. (*See id.*)

Although the jury instructions informed the jury that they could convict on the lesser included offenses if "any of you are not convinced beyond a reasonable doubt" that

_____

To avoid confusing the jury, the court and the parties agreed to structure the verdict form with questions 1-5 for the first phase of the bifurcated trial, even though those questions pertained to Counts 2-4, and 6-7 of the superseding indictment. The court notes that Question 1 on the verdict form corresponds to Count 2 in the indictment, Question 2 corresponds to Count 3, Question 3 corresponds to Count 4, Question 4 corresponds to Count 6, and Question 5 corresponds to Count 7.

Mr. Hendrix was guilty of the greater offenses (*see* Final Jury Instr. at 22, 25), the verdict form did not instruct the jury how to complete the form in the event that the jury could not reach a verdict on the greater offenses, rather than finding Mr. Hendrix guilty or not guilty on the greater offenses (*see* Jury Verdict at 2-3, 5-6). The court provided the parties with advanced copies of the jury instructions and verdict form and took formal exceptions to both. (*See* 12/20/19 Dkt. Entry (Dkt. # 188).) Although Mr. Hendrix took exception to the court's refusal to issue a lesser included offense instruction for Count 2 related to possession of methamphetamine with intent to distribute based on the 271.3 grams of methamphetamine found in the U-Haul, neither the Government nor Mr. Hendrix took exception to the language of the lesser included jury instructions for Counts 3 and 6 or to the verdict form.

**C.    Jury Deliberations and Verdict**

The jury commenced deliberations on the first phase of the trial at 11:31 a.m. on December 20, 2019. (*See* 12/20/19 Dkt. Entry.) At 3:21 p.m., the jury orally advised the clerk that it might be deadlocked. (*See id.*; *see also* 12/20/19 Tr. (Dkt. # 212-1) at 2:2-3.) The court informed the parties that the jury "may be deadlocked" and informed the parties that the court proposed to respond by (1) reading the neutral version of the *Allen* charge found at Ninth Circuit Model Criminal Jury Instruction No. 7.7, which encourages the jury to continue deliberating in an effort to reach a unanimous verdict; and (2) instructing the jury that "[i]f you have reached a partial verdict, you can return that verdict to the court and leave the other questions as unresolved." (*See* 12/20/19 Tr. at 2:1-3:3); *see also* Ninth Circuit Model Criminal Jury Instructions No. 7.7 (2010). Both

parties agreed to the court's proposed response. (*See id.* at 3:21-22, 4:11.) Accordingly, the court recalled the jury and asked the foreperson to confirm "that the jury at this point is unable to reach a decision," which the foreperson confirmed. (*See id.* at 4:21-5:2.) After receiving that confirmation, the court read Instruction No. 7.7 and instructed the jury that it could reach a partial verdict. (*See id.* at 5:3-6:12.) On the partial verdict point, the court specifically stated that "[i]f you are unanimous on some of the questions, you can check those, then come back and tell me that you are unable to reach a verdict on others." (*See id.* at 6:6-12.) The court then sent the jury back to the jury room to continue deliberating. (*See id.* at 6:13-16.)

The jury submitted two written questions at 4:18 p.m. on December 20, 2019. (*See* 12/20/19 Dkt. Entry; *see* 1st Jury Question (Dkt. # 193); 2d Jury Question (Dkt. # 195).) The first question, which had multiple parts, stated: "May you please elaborate on your instructions to the jury on how we may arrive at a partial v[e]rdict? Does a partial verdict negate the possibility of the defendant to be retried?" (1st Jury Question.) The second question stated: "We need further clarification or interpretation on Jury Instruction 19." (2d Jury Question.) Jury instruction 19 was the instruction regarding the lesser included offense charge on Count 3. (*See* Final Jury Instr. at 22.)

Again, the court convened with the parties to discuss its proposed answers to the jury's questions. The court first noted that it interpreted the first portion of the first question to mean "how do we fill out the form" for a partial verdict, as opposed to "how do we deliberate" to reach a partial verdict. (*See* 12/20/19 Tr. at 7:12-17.) The court proposed to inform the jury that it should "fill out the verdict form for those questions

that you arrived at a resolution of and bring it out with you out into the courtroom." (*See id.* at 7:25-8:3, 8:11-21.)  For the second portion of the first question, the court informed the parties that it believed that the jury's "retrial" question related to the issue of Mr. Hendrix's punishment, which is an issue for the court to resolve.  (*See id.* at 7:19-24, 8:11-21.)  The court proposed that it would respond to the question by rereading jury instruction 29, which instructed the jury that it was not to consider the impact of its verdict.  (*See id.*)  For the second question regarding instruction number 19, the court proposed that it would inform the jury that the words in the instruction must be given their plain meaning and the instruction speaks for itself.  (*See id.* at 9:7-19.)  Both parties agreed with each of the court's proposals (*see id.* at 8:22-25, 9:7-19), so the court instructed the jury accordingly (*see id.* at 9:21-11:1).  On the partial verdict question, specifically, the court instructed the jury that, to reach a partial verdict, it should "[c]omplete the portions of the verdict form that you are able to reach unanimous agreement on and do nothing in regards to the ones that you can't reach unanimous agreement on."  (*See id.* at 9:24-10:4.)

After the court gave the jury these instructions, the court sent the jury home for the weekend.  (*See id.* at 11:2-3.)  Once the jury had left for the day, the court noted to the parties that the jury appeared to be "one batch of unhappy campers."  (*See id.* at 11:24-25.)

The jury returned at 9:00 a.m. on the following Monday, December 23, 2019. (*See* 12/23/19 Dkt. Entry (Dkt. # 196).)  Because the jury asked about partial verdicts at the end of the day on Friday, the court reminded the jury how to reach a partial verdict by

reiterating the instructions the court gave on Friday. (*See* 12/23/19 Tr. (Dkt. # 212-2) at 3:22-4:5.) Specifically, the court said: "You do not need to reach a unanimous agreement on each of the counts that is in this action. If you agree on some and you are unable to reach a verdict on others, you can tell me which ones you agree on, and just leave the other ones blank. That's what a partial verdict is." (*See id.*) The jury returned to the jury room to continue deliberations at 9:03 a.m. (*See* 12/23/19 Dkt. Entry.)

At 11:12 a.m., the court received a third jury question: "For a partial verdict, is it possible to give a verdict on a subsection of a charge without giving a verdict for the initial charge[?]" (3d Jury Question (Dkt. # 198) at 1.) After a lengthy discussion with counsel for both parties about the appropriate response, the court and the parties agreed to respond to the question in writing and say: "The court is unable to respond to this question. Please refer to the jury instructions and the verdict form." (*See id.* at 2; 12/23/19 Tr. at 5:22-14:11.) At 12:36 p.m., the jury signaled to the court that it had another question, and one of the jurors orally advised the Courtroom Deputy, in the presence of the other jurors, "that she is being insulted for her views, and she wants it to stop." (*See* 12/23/19 Tr. at 14:15-21.)

At 1:02 p.m., while the court and the parties discussed the appropriate response to the information that one of the jurors felt she was being insulted for her views, the jury informed the court that it had reached a verdict. (*See id.* at 14:22-19:11; 12/23/19 Dkt. Entry.) The court brought the jury out and had the following discussion with the jury and its foreperson:

*//*

THE COURT:  Juror No. 1, has the jury reached a verdict on some or all of the causes of action?

THE FOREPERSON:  We have reached a verdict on two charges.

THE COURT:  All right. Would you please give it to the clerk?

THE COURT:  Mr. Foreperson, in regards to the counts that you were unable to reach a verdict, is it your opinion that the jury is deadlocked?

THE FOREPERSON:  Yes.

THE COURT:  Is there any member of the jury who disagrees with that assessment?

THE COURT:  The record should reflect that there are none.  Then I'm going to accept the jury's verdict on the two charges that you have been able to reach a unanimous verdict on.

(12/23/19 Tr. at 19:15-20:5.)  The court then read the verdict into the record on a question-by-question basis.  (*See id.* at 20:6-21:9.)  The court stated that the jury did not answer Questions 1, 2, 3, 4, and 5 related to each of the greater offenses in Counts 2-4 and 6-7, but unanimously found the defendant guilty of the lesser included offenses for Counts 3 and 6 in response to Questions 2B and 4B.[3]  (*See id.*; Jury Verdict.)

The court then informed the parties that "I'm going to, based on the answers provided by the jury, declare a mistrial in regards to Count 1, Count 3, and Count 5, and I am going to accept the jury's verdict in regards to the two counts that they found on." (*See* 12/23/19 Tr. at 21:10-13.)  The court later confirmed that it inadvertently referred to question numbers instead of count numbers when it said "Count 1, Count 3, and Count

---

[3] The jury also answered Question 2C, but that question has no bearing on this motion. (*See* Jury Verdict at 4.)

5," and that the court meant to refer to Count 2, Count 4, and Count 7 when it declared a mistrial. (*See id.* at 26:12-19.) At the request of the Government, the court polled the jury and each individual juror confirmed that the verdict form represented his or her individual verdict. (*See id.* at 21:14-24:11.)

## III. ANALYSIS

On January 10, 2020, the Government informed the court that it intended to retry Mr. Hendrix on all five of the greater offenses from the first phase of the trial—Counts 2-4 and 6-7. (*See generally* Not.) Mr. Hendrix objects to retrial on Double Jeopardy grounds. (*See generally* Resp.) Mr. Hendrix's briefing raises four interwoven Double Jeopardy arguments that Mr. Hendrix's counsel organized succinctly at oral argument: (1) Double Jeopardy bars retrial Counts 2-4 and 6-7 because there was no "manifest necessity" justifying the court's mistrial declaration (*see id.* at 10-11); (2) even if the court's declaration of mistrial was appropriate for Counts 2, 4, and 7, the court failed to declare a mistrial on Counts 3 and 6, which prevents retrial on those counts (*see* Resp. at 1-9); (3) the jury's verdict on the lesser included offenses for Counts 3 and 6 prevents retrial on those counts (*see id.*); and (4) if the court agrees that Counts 3 and 6 cannot be retried, that prevents the Government from retrying Count 7 and any portion of Count 4 that is based on Count 3 (*see id.* at 9-10). The court first outlines the applicable legal standards before addressing the issues on the merits.

//

//

//

**A.      Legal Standards**

    1.      Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment dictates that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend V. "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003) (citation omitted). "This guarantee recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek." *Currier v. Virginia*, --- U.S. ---, 138 S. Ct. 2144, 2149 (2018) (citations omitted). "At the same time, . . . the Clause was not written or originally understood to pose 'an insuperable obstacle to the administration of justice' in cases where 'there is no semblance of [these] type[s] of oppressive practices.'" *Id.* (quoting *Wade v. Hunter*, 336 U.S. 684, 688-689 (1949)).

    2.      Mistrial

"Trial judges may declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so." *Renico v. Lett*, 559 U.S. 766, 773-74 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)). "The decision whether to grant a mistrial is reserved to the 'broad discretion' of the trial judge." *See Renico*, 559 U.S. at 774 (quoting *Illinois v. Somerville*, 410 U.S. 458, 462 (1973)). Although the "manifest necessity" burden "is a heavy one," the

Supreme Court has clarified that "the key word 'necessity' cannot be interpreted literally." *See Arizona v. Washington*, 434 U.S. 497, 506-07 (1978).

Declaring a mistrial where "the jury was unable to reach a verdict . . . has long been considered the 'classic basis' establishing such a [manifest] necessity." *Blueford v. Arkansas*, 566 U.S. 599, 609 (2012) (quoting *Arizona*, 434 U.S. at 509). The reasons for "allowing the trial judge to exercise broad discretion" are "especially compelling" in cases involving a deadlocked jury. *See Arizona*, 434 U.S. at 509. "There, the justification for deference is that 'the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate.'" *Renico*, 559 U.S. at 774 (quoting *Arizona*, 434 U.S. at 510, n.28). "In the absence of such deference, trial judges might otherwise 'employ coercive means to break the apparent deadlock,' thereby creating a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors.'" *Id.* (quoting *Arizona*, 434 U.S. at 510, 509).

Relevant factors for courts to consider in determining whether to declare a mistrial include "the jury's collective opinion that it cannot agree, the length of the trial and complexity of the issues, the length of time the jury has deliberated, whether the defendant has objected to a mistrial, and the effects of exhaustion or coercion on the jury." *Harrison v. Gillespie*, 640 F.3d 888, 904 (9th Cir. 2011) (en banc) (quoting *Rogers v. United States*, 609 F.2d 1315, 1317 (9th Cir. 1979)). "The most critical factor is the jury's own statement that it is unable to reach a verdict." *United States v.*

*Hernandez-Guardado*, 228 F.3d 1017, 1029 (9th Cir. 2000) (citing *United States v. Cawley*, 630 F.2d 1345, 1348-49 (9th Cir. 1980)).

**B.     The Court's Declaration of Mistrial**

The court begins by temporarily setting aside Mr. Hendrix's specific arguments regarding Counts 3 and 6 and addressing Mr. Hendrix's overarching argument that there was no "manifest necessity" justifying a mistrial on any of the five counts. (*See* Resp. at 10-11; Surreply at 4.) The gravamen of Mr. Hendrix's argument on this point is that "the Court moved too quickly to a declaration of a mistrial" and erred by failing to distinguish between "deadlock" and "genuine deadlock." (*See* Resp. at 11.) The court disagrees.

The court acted well-within its "broad discretion" to declare a mistrial. *See Renico*, 559 U.S. at 773-74. Each of the factors that the Ninth Circuit advises courts to consider before declaring a hung jury weighed in favor of a mistrial. *See Harrison*, 640 F.3d at 904-05 (noting that courts should consider "the jury's collective opinion that it cannot agree, the length of the trial and complexity of the issues, the length of time the jury has deliberated, whether the defendant has objected to a mistrial, and the effects of exhaustion or coercion on the jury"). The jury twice informed the court that it could not reach a unanimous agreement on all counts. (*See* 12/20/19 Tr. at 2:2-3; 12/23/19 Tr. at 19:15-20:5.) On both occasions, the court questioned the foreperson about that conclusion to confirm that the jury was, in fact, deadlocked. (*See* 12/20/19 Tr. at 4:21-5:2; 12/23/19 Tr. at 19:15-20:5.) After the jury informed the court for the second time that it could not reach a conclusion, the court asked the jury as a whole if they disagreed with the foreperson's conclusion that the jury was "deadlocked." (*See*

12/23/19 Tr. at 19:15-20:5.)  No juror disagreed with the foreperson.  (*See id.*)  Thus, the

jury's own statement, which is "the most critical factor" for courts to consider,

*Hernandez-Guardado*, 228 F.3d at 1029, confirms that the jury was deadlocked.

The length and complexity of trial, the duration of the jury deliberations, and the

absence of an objection from Mr. Hendrix also weigh in favor of finding the requisite

manifest necessity for a mistrial.  *See Harrison*, 640 F.3d at 904-05.  The first phase of

the trial was, at most, modestly complex.  The jury heard testimony from 17 witnesses

and the entire trial—including *voir dire* and jury instructions—took less than four full

trial days.  (*See* 12/16/19 Dkt. Entry; 12/17/19 Dkt. Entry (Dkt. # 181); 12/18/19 Dkt.

Entry (Dkt. # 184) 12/19/19 Dkt. Entry (Dkt. # 185); 12/20/19 Dkt. Entry.)  Despite the

straightforward nature of the trial, the jury deliberated for approximately nine hours,

across two days.  (*See* 12/20/19 Dkt. Entry; 12/23/19 Dkt. Entry.)  Although Mr. Hendrix

now objects to the mistrial, neither the Government nor Mr. Hendrix raised an objection

during the proceedings before the court discharged the jury.  (*See generally* 12/23/19 Tr.)

Each of these factors supports the court's decision to declare a mistrial.

Finally, the court notes that the potential "effects of exhaustion or coercion on the

jury" were particularly acute here.  *See Harrison*, 640 F.3d at 904-05.  The jury first

informed the court that it may be deadlocked after about four hours of deliberations.  (*See*

12/20/19 Dkt. Entry; *see also* 12/20/19 Tr. at 2:2-3.)  After the court gave an *Allen*

charge, the jury deliberated for approximately five additional hours before informing the

court for a second time that it was deadlocked.  (*See* 12/23/19 Dkt. Entry.)  The record

shows that the impact of the continued deliberations weighed heavily on the jury.  The

court noted at the end of the first day of deliberations that the jury appeared to be "one batch of unhappy campers." (*See* 12/20/19 Tr. at 11:24-25.) Tensions only worsened. At 12:36 p.m. on Monday—after roughly eight and a half hours of deliberations—one juror advised court staff in front of the rest of the jury "that she [was] being insulted for her views, and she want[ed] it to stop." (*See* 12/23/19 Tr. at 14:15-21.) The jury reached a partial verdict and confirmed with the court that they were "deadlocked" less than a half hour later. (*See* 12/23/19 Dkt. Entry; 12/23/19 Tr. at 19:15-20:5.)

Mistrial was the court's only viable option at that point in time. The court had already given an *Allen* charge and, as such, could not have given another one without committing reversible error. *See United States v. Evanston*, 651 F.3d 1080, 1085 (9th Cir. 2011). Further, if the court had sent the jury back to the deliberation room to continue trying to reach a unanimous verdict, the court could have introduced significant coercive pressure on the one juror who had made it known to the court and to her fellow jurors that she felt she was being insulted by the rest of the jury. *United States v. Jefferson*, 566 F.3d 928, 936 (9th Cir. 2009) ("A district court need not, and indeed should not, order continued deliberations once it becomes apparent that hopeless deadlock exists."). Trial courts are granted with broad discretion to declare a hung jury so that courts can avoid "employ[ing] coercive means to break the apparent deadlock" and "creating a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *See Renico*, 559 U.S. at 774 (quotations omitted); *Harrison*, 640 F.3d at 903 (noting concern that court's actions in response to hung jury could provide appearance that the court has "join[ed] one of the

factions in a hung jury"); *Evanston*, 651 F.3d at 1085 (9th Cir. 2011) ("Extraordinary caution must be exercised when acting to break jury deadlock.").  By the time the jury reached its partial verdict, the court had pushed the jury as far as it could.

Mr. Hendrix argues that the court failed to establish "genuine" deadlock because it did not specifically ask each juror whether he or she believed continued deliberations could result in a verdict.  (*See* Resp. at 11.)  Again, the court disagrees.  The law does not require that judge or jury incant specific magic words before the court may find the requisite manifest necessity to declare a mistrial.  Quite the contrary, in fact.  The Supreme Court has "expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial."[4] *See Renico*, 559 U.S. at 775 (quoting *Wade*, 336 U.S. at 691); *see also Harrison*, 640 F.3d at 902 ("[T]he Supreme Court has never adopted a per se rule regarding trial judges' responses to deadlocked juries.").  Instead, as the Ninth Circuit recognizes, "the [Supreme] Court has emphasized the importance of deferring to the trial judge's discretion in cases involving deadlocked juries."  *Harrison*, 640 F.3d at 902.

At oral argument, Mr. Hendrix's counsel pinned his argument that the court was required to ask the jury if continued deliberations could result in a verdict on an excerpt

---

[4] The court rejects Mr. Hendrix's argument that the Supreme Court's decision in *Renico* does not control or is somehow less persuasive because it is an Antiterrorism and Effective Death Penalty Act ("AEDPA") case.  (*See* Resp. at 10-11.)  As Mr. Hendrix persuasively argued in response to the Government's attempts to distinguish *Brazzel v. Washington*, 491 F.3d 976 (9th Cir. 2007)—another AEDPA case—the fact that a federal decision was issued under AEDPA does not render the rules of decision or rationale provided in that decision wholesale inapplicable to non-AEDPA cases.  (*See* Resp. at 5-6.)  Here, the court cites *Renico* for its teachings about a trial court's authority to declare a mistrial under federal law, which are not specific to AEDPA cases.  *See Renico*, 559 U.S. at 774-75.

from the Ninth Circuit's decision in *Hernandez-Guardado* and the commentary to Ninth

Circuit Model Criminal Jury Instruction No. 7.8. *See Hernandez-Guardado*, 228 F.3d at

1029; Ninth Circuit Model Criminal Jury Instruction No. 7.8 (2010). Neither source

persuades the court that its mistrial declaration was improper.

First, although the Ninth Circuit's model jury instructions are a valuable resource

on which the court often relies, the instructions and accompanying commentary that Mr.

Hendrix cited at oral argument are not binding authority. *See* Ninth Circuit Model

Criminal Jury Instructions, Introduction to 2010 Edition (2010) ("The instructions in this

Manual are models. They are not mandatory, and must be reviewed carefully before use

in a particular case. They are not a substitute for the individual research and drafting that

may be required in a particular case, nor are they intended to discourage judges from

using their own forms and techniques for instructing juries."). Moreover, even if the

commentary Mr. Hendrix cites was binding—which it is not—Instruction No. 7.8

includes only a "suggested script" for the court and does not mandate that the court ask

any specific questions to the jury. *See* Ninth Circuit Model Criminal Jury Instruction No.

7.8 (2010).

The court is also uncertain that the portion of *Hernandez-Guardado* that Mr.

Hendrix cites—that "[o]n receiving word from the jury that it cannot reach a verdict, the

district court must question the jury to determine independently whether further

deliberations might overcome the deadlock"—remains good law. *See*

*Hernandez-Guardado*, 228 F.3d at 1029. *Renico* and *Harrison*—both of which were

decided after *Hernandez-Guardado*—reject "mechanical" or "rigid" controls on the trial

court's discretion to declare a mistrial.[5]  *See Renico*, 559 U.S. at 775; *Harrison*, 640 F.3d at 902.  The court reads those cases as saying that there is nothing specific that trial courts "must" do before declaring a mistrial so long as the trial court reasonably exercises its discretion.  *See Renico*, 559 U.S. at 774-75; *Harrison*, 640 F.3d at 902-03.  Nevertheless, even if it remains true in this Circuit that trial courts "must question the jury to determine independently whether further deliberations might overcome the deadlock," the court did question the jury both times the jury indicated it was deadlocked and confirmed that the jury was "deadlocked."  (*See* 12/20/19 Tr. at 4:21-5:2; 12/23/19 Tr. at 19:15-20:5.)  Mr. Hendrix may have preferred that the court ask different questions or frame its questions in a different manner, but the jury's answers to the court's questions—combined with the other evidence in the record suggesting deadlock—were more than enough for the court to "determine independently" that further deliberations would not overcome the jury's deadlock, which is all that the law Mr. Hendrix cites requires.  *See Hernandez-Guardado*, 228 F.3d at 1029.

## C.    Counts 3 and 6

Mr. Hendrix raises three closely-related Double Jeopardy arguments specific to Counts 3 and 6:  (1) the court did not declare a mistrial on Counts 3 and 6; (2) if the court did declare a mistrial, that declaration was improper because there was no manifest

---

[5] The court recognizes, of course, that questioning the jury about the extent of its deadlock or about the potential that further deliberations would result in a verdict is both appropriate and useful in many contexts.  *See* Ninth Circuit Model Criminal Jury Instruction No. 7.8 (2010) (offering a "suggested script" for trial court's post-*Allen* charge inquiry).  The court takes issue only with Mr. Hendrix's argument that specific questions are mandatory in order to preserve a mistrial.

necessity for a mistrial; and (3) the jury's conviction on the lesser offenses constitutes an "implied acquittal" on the greater offenses that bars retrial. The court addresses each of these arguments in turn.

### 1.   Declaration of Mistrial

The court rejects Mr. Hendrix's argument that the court's declaration of mistrial did not apply to the greater offenses of possession with intent to distribute charged in Counts 3 and 6. (*See, e.g.*, Resp. at 4 ("[T]his [c]ourt did not make any determination of 'hopeless deadlock' on the greater charges, nor did the [c]ourt declare a mistrial on the greater charges."); Surreply at 2-3 ("Retrial requires some declaration on the [c]ourt's part, even if not the formal words 'I declare a mistrial.'").) The court recognizes that its oral declaration of a mistrial focused on Counts 2, 4, and 7 and that the court did not explicitly discuss the distinction between the greater and lesser offenses charged in Counts 3 and 6. (*See* 12/23/19 Tr. at 19:15-24:17, 26:12-19.) However, Mr. Hendrix's argument on this point unfairly elevates form over function and fails to view the jury's verdict and the court's ruling in the appropriate context.

Regardless of what the court said or failed to say regarding particular counts—or, in the case of Counts 3 and 6, subsections of counts—the record is clear as to what the court did. The court read the jury's verdict, confirmed with the jury that it was deadlocked, and twice stated that the court would "accept the jury's verdict on the two charges that [the jury has] been able to reach a unanimous verdict on" before declaring a mistrial. (*See id.* at 19:15-20:5, 21:10-13 ("I'm going to accept the jury's verdict in regards to the two counts that they found on.").) The jury's verdict clearly shows that the

only "two charges" the jury "reach[ed] a unanimous verdict on" were the lesser included offenses of possession of a controlled substance charged in Counts 3 and 6.  (*See* Jury Verdict.)  Outside of its responses on the two lesser included offenses, the jury left the verdict form blank—as the court, with the consent of the parties, instructed the jury to do to signal to the court that it had been unable to reach a unanimous verdict.  (*See* Jury Verdict; 12/20/19 Tr. at 6:6-12, 9:24-10:4; 12/23/19 Tr. at 3:22-4:5.)  Thus, the court's intent—as evidenced by its statements on the record and the jury's verdict in response to the court's instructions regarding partial verdicts—was to accept the jury's unanimous verdict on the two lesser included offenses and otherwise declare a mistrial.

Mr. Hendrix's interpretation of the record focuses too narrowly on the fact that the court stated that it was declaring a mistrial on Counts 2, 4, and 7 without addressing Counts 3 and 6.  With the benefit of hindsight and a written transcript of the record that the court did not have at the time it ruled from the bench, the court acknowledges that it could have clarified that its declaration of a mistrial applied to the greater offenses in Counts 3 and 6 but not the lesser included offenses in those same counts.[6]  *See Carothers*,

---

[6] From the court's perspective, the difficulty with declaring a mistrial on this particular verdict was that Counts 3 and 6 included both the greater offenses of possession with intent to distribute and the lesser offenses of simple possession.  If the lesser and included offenses had been charged in separate counts, the court's mistrial declaration could have focused on specific count numbers—as the court did with Counts 2, 4 and 7.  But the fact that the greater and lesser offenses were charged in the same counts left the court stuck between a rock and a hard place when the jury returned a unanimous verdict on the two lesser included offenses but deadlocked on the greater offenses.  Had the court declared a mistrial on Counts 3 and 6, that would have invalidated the jury's unanimous verdict on the lesser included offenses.  *See United States v. Carothers*, 630 F.3d 959, 963-64 (9th Cir. 2011) (noting that trial court erred by declaring mistrial on lesser included offenses where jury reached a unanimous verdict on the lesser included offenses but deadlocked on the greater offenses).  On the other hand, however, the

630 F.3d at 963-64 (noting that trial court should have declared a mistrial on the greater

offense of possession with intent to distribute after jury deadlocked on that charge but

accepted the jury's verdict on the lesser included offense of simple possession).  But, as

discussed above, both the Supreme Court and Ninth Circuit have rejected attempts to

apply "mechanical" or "rigid" controls on the trial court's authority to declare a mistrial.

*See Renico*, 559 U.S. at 774-75; *Harrison*, 640 F.3d at 902-03.  In light of that guidance,

the court concludes that it need not turn a blind eye to the context in which the jury gave

its verdict and overturn an otherwise proper declaration of mistrial merely because the

court did not specifically state on the record that its declaration of a mistrial applied in

part to Counts 3 and 6.

Moreover, unlike the court's explanation of its ruling outlined above, Mr.

Hendrix's interpretation is logically inconsistent.  The record shows that the court

explicitly declared a mistrial on Count 7 (*see* 12/23/19 Tr. at 21:10-14, 26:12-19), which

charges Mr. Hendrix with possession of a firearm in furtherance of a drug trafficking

crime based on the firearm found in a bag attached to Mr. Hendrix's person on August

24, 2018.  (*See* Resp. at Sup. Indictment at 4-5; Gov't Trial Br. at 2.)  The court

instructed the jury that it must find that Mr. Hendrix "committed the crime of Possession

of Methamphetamine with Intent to Distribute related to the August 24, 2018, incident"

as charged in Count 6 in order to convict Mr. Hendrix on Count 7.  (*See* Final Jury Instr.

at 28.)  Thus, if Mr. Hendrix is correct that the court did not declare a mistrial on the

---

court's decision to "accept" the verdict on the two lesser included offenses for Counts 3 and 6
without discussing the greater offenses resulted in Mr. Hendrix's current objections.

greater offense in Count 6, then the court's explicit declaration of a mistrial on Count 7 becomes pointless because Count 7 could not be retried due to the jury's verdict on Count 6. On the other hand, viewing the court's ruling as a mistrial on all five greater counts results in a logically consistent explanation for the court's statements on the record in light of the jury's verdict.

  2. <u>"Manifest Necessity" and "Implied Acquittal"</u>

  The court considers Mr. Hendrix's final two arguments together because those arguments are essentially different variants of the same Double Jeopardy point. Mr. Hendrix argues that there was no "manifest necessity" for a mistrial on Counts 3 and 6 and that the jury's verdict was instead an "implied acquittal" on those counts. (*See* Resp. at 1-9; Surreply at 1-2.) These arguments attempt to sway the court toward one side of two well-established lines of Double Jeopardy authority. First, "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause." *Richardson v. United States*, 468 U.S. 317, 324 (1984); *see also Arizona*, 434 U.S. at 509 ("[W]ithout exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial."). Second, where a defendant is charged with a greater offense and a lesser included offense and the jury convicts on the lesser included offense but remains silent "without returning any express verdict" on the greater offense, the jury's verdict is considered an implied acquittal on the greater offense that bars retrial of that offense. *See Green v. United States*, 355 U.S. 184, at 189-91 (1957); *Brazzel*, 491 F.3d at 981 ("An implied acquittal occurs when a jury returns a guilty verdict as to a lesser included or lesser alternate charge, but remains silent as to other

charges, without announcing any signs of hopeless deadlock.").  Regardless of whether

Mr. Hendrix casts his argument in terms of an absence of manifest necessity to support a

mistrial or sufficient evidence of an implied acquittal that bars retrial, his point is that this

court should apply *Green* and its progeny—as opposed to *Richardson* and its progeny—

and find that he cannot be retried because the jury remained silent and was not

"genuinely deadlocked" on Counts 3 and 6.  (*See* Resp. at 1-9.)

The parties' dispute on this issue centers on three Ninth Circuit cases, *Brazzel*, 491

F.3d 976; *Jefferson*, 566 F.3d 928; and *Carothers*, 630 F.3d 959.  (*See* Not. at 4-8; Resp.

at 2-7.)  In *Brazzel*, the defendant was charged with first degree attempted murder and the

lesser included offense of first degree assault, amongst other charges, in state trial court.

491 F.3d at 979.  The jury instructions for the first degree attempted murder charge

instructed the jury that "[i]f you cannot agree on a verdict, do not fill in the blank

provided in [the verdict form]" and also advised the jury that if it "cannot agree on" the

first degree attempted murder charge, it could "consider the alternative crime" of first

degree assault.  *See id.* at 979-80.  The jury convicted the defendant of first degree

assault, but "remained silent on the first degree attempted murder charge, leaving the

verdict form blank."  *Id.* at 979.  The court noted that, "at the conclusion of their

deliberations, the jurors did not claim to be hung or announce any splits or divisions."  *Id.*

The court elaborated that jurors were asked during polling only if the verdict form

reflected their verdict and not whether the jury was deadlocked.  *Id.* at 984.  The

government also did not ask the court to declare a mistrial or seek to retry the count that

the jury remained silent on.  *See id.* at 984, 979.  Ultimately, the trial court discharged the

jury without declaring a mistrial, took the convictions as final, and sentenced the defendant. *Id.* at 979. Due to a remand after an appeal on an unrelated issue, however, the defendant was tried a second time before the case reached the Ninth Circuit. *See id.* at 980.

On appeal after the defendant's second trial, the Washington Court of Appeals treated the jury's silence on the greater offenses in the first trial as an implied acquittal, but held that the Double Jeopardy issue was moot because the defendant was also impliedly acquitted on the greater offenses in his second trial. *See id.* at 982-83. Thus, the Ninth Circuit noted that the question before it under AEDPA was whether the state appellate court clearly erred when it treated the jury's silence as an implied acquittal. *See id.* The Ninth Circuit held that the state court did not clearly err. *See id.* at 983. In reaching that conclusion, the court assumed that the jury followed instructions and left the verdict form blank on the greater offense because it could not reach unanimous agreement on that offense. *See id.* at 984. However, the court construed that failure to agree merely as "silence," as opposed to "genuine[] deadlock" because the trial court did not make any inquiry "to determine whether the jury had 'genuinely deadlocked' or simply moved to the lesser alternative assault charge as a compromise." *Id.* The court also noted that the government did not construe the silence as "hanging" or seek retrial. *Id.* at 984. Ultimately, the court concluded that the jury's verdict was an implied acquittal under federal law because "[g]enuine deadlock is fundamentally different from a situation in which jurors are instructed that if they 'cannot agree,' they may

//

compromise by convicting of a lesser alternative crime, and they then elect to do so without reporting any splits or divisions when asked about their unanimity." *Id.*

In *Jefferson*, the government charged the defendant with attempted possession of methamphetamine with intent to distribute and the lesser included offense of attempted possession. *See* 566 F.3d at 932. The jury instructions advised the jury that "if after all reasonable efforts you are unable to reach a verdict [on the intent to distribute offense], you should record the decision on the verdict form and go on to consider whether defendant is guilty or not of the lesser included offense of Attempted Possession of a Methamphetamine." *Id.* The jury initially returned with a verdict form on which the jury crossed out the word "do" and replaced it with "were unable to" in the following sentence: "We, the Jury . . . do find the Defendant, JOHN D. JEFFERSON, _____ (Guilty or Not Guilty) of the crime of Attempted Possession of a Controlled Substance with Intent to Distribute." *Id.* The jury also wrote "The jury was unable to come to a decision on this verdict" in response to the greater offense. *Id.* On the verdict form for the lesser included offense, however, the jury found the defendant guilty. *Id.*

At the request of the defendant, the court read the jury an *Allen* charge and ordered continued deliberations. *Id.* After continued deliberations, the jury sent a question to the court about a partial verdict and what the jury could do if it was "unable to come to a decision" on the greater offense. *Id.* After the court answered the question, the jury continued deliberating before returning with another interlineated verdict form that reported the same conclusion—no decision on the greater offense and a conviction on the lesser included offense. *See id.* The court then "polled the jurors as to whether further

deliberations might produce a verdict on the intent to distribute offense, all of whom indicated that further deliberations would be unavailing." *Id.* The Ninth Circuit also noted that "[n]either the government nor Jefferson objected to the district court declaring a mistrial because of the hung jury" until after the government announced it would retry the defendant on the greater offense. *Id.* at 932-33.

On these facts, the Ninth Circuit rejected the defendant's Double Jeopardy challenge to retrial on the greater offense of possession with intent to distribute. *See id.* at 935-36. The court cited *Brazzel* for the proposition that "[a]n implied acquittal occurs when a jury returns a guilty verdict as to a lesser included or lesser alternate charge, but remains silent as to other charges, without announcing any signs of hopeless deadlock," *id.* at 935 (citing *Brazzel*, 491 F.3d at 981), but found that the jury "did not impliedly acquit [the defendant] because it was not 'silent' on the issue of Jefferson's intent to distribute." *Id.* The court noted that the interlineated jury form and the confirmation during polling that the jury was deadlocked were sufficient to find that the jury was "anything but 'silent' in this case" on the greater offense. *Id.* at 935-36. The court also concluded that there could be "no serious dispute" that there was sufficient "manifest necessity" for a mistrial because the jury twice informed the court that it could not reach a verdict, the court had read an *Allen* charge, the jury had asked a question about partial verdicts, and the court confirmed the jury's deadlock during polling. *See id.* at 936.

The defendant in *Carothers* was charged with possession of methamphetamine with intent to distribute. 630 F.3d at 961-62. At the defendant's request, the trial court instructed the jury on the lesser included offense of simple possession. *Id.* The trial

court's instruction on the lesser included offense of simple possession was essentially identical to the instruction that the court gave in Mr. Hendrix's trial. *Compare id.* at 962 *with* (Final Jury Instr. at 22, 25). Additionally, like this court, the *Carothers* court provided the jury with a verdict form that was inconsistent with the jury instruction on the lesser included offense in that the verdict form did not instruct the jury that it could consider the lesser included offense in the event that the jury could not reach unanimous agreement on the greater offense. *See Carothers*, 630 F.3d at 962 ("Thus the verdict form, unlike the instructions, permitted the jury to turn to the lesser included offense only after acquitting [the defendant] of the greater offense."). The defendant's counsel recognized the inconsistency and asked the court to harmonize the verdict form with the instructions, but the court refused to do so. *See id.*

After deliberations, the jury informed the court "that it was 'unanimous on the charge of possession' but 'not unanimous on the possession with the intent to distribute'" charge. *Id.* at 962-63. The court ordered the jury to continue deliberating "as long as one or more of you believe it would be beneficial in reaching a verdict." *Id.* at 963. "After further deliberation, however, the jury confirmed that it had 'reached a unanimous verdict, on possession, but are hung on the intent to distribute.'" *Id.* Although the jury indicated that it had reached a unanimous verdict on the lesser included offense, the court "declared a mistrial on both charges, with the government's support but over [defendant's] objection" due to the inconsistencies between the jury instructions and the verdict form. *Id.* By the time the defendant moved to dismiss, however, the court had "realized it had improperly declared a mistrial on simple possession" and concluded that,

as a result of the improper mistrial on the lesser included offense, Double Jeopardy barred retrial on both the greater offense and the lesser. *Id.*

As relevant to this case, the Ninth Circuit concluded that the district court's declaration of a mistrial on the greater offense was proper, which meant that the Double Jeopardy Clause permitted retrial of that offense "unless an exception applies."[7] *See id.* at 963. The court cited *Richardson* for the proposition that "the Double Jeopardy Clause allows retrial following a jury's genuine deadlock," *see id.* at 963 (citing *Richardson*, 468 U.S. at 323-24), and *Jefferson* in support of the conclusion that the jury's unanimous verdict on the lesser included offense did not bar retrial, *see id.* at 963 n.2 (citing *Jefferson*, 566 F.3d at 935-36). The court also concluded that the trial court erred in declaring a mistrial on the lesser included offense without considering alternative instructions to the jury that could have cured the inconsistency between the verdict form and the jury instructions. *See id.* at 964.

The court concludes that this case is more closely aligned with *Carothers* and *Jefferson* than *Brazzel*. The issue with Mr. Hendrix's reliance on *Brazzel* is that the jury in this case provided significantly more evidence of deadlock than the *Brazzel* jury did. *See Brazzel*, 491 F.3d at 979, 984. The *Brazzel* court noted that an implied acquittal requires that the jury "remain[] silent . . . without announcing any signs of hopeless deadlock." *Id.* at 981. *Brazzel* ultimately turned out the way that it did because, unlike

---

[7] The central issue in *Carothers* was "whether the improperly declared mistrial on simple possession creates an exception to the general rule permitting retrial on possession with intent to distribute." *Id.* at 964. The Ninth Circuit concluded that there was no such exception and permitted retrial. *See id.* at 964-66.

this case, there were not "any signs" of hopeless deadlock in *Brazzel*. *See id.* at 979, 984. The Ninth Circuit noted that the jury "offered no indication of an inability to reach a verdict," the government did not consider the jury hung or seek retrial, and the trial court made "no inquiry" into whether the jury was actually deadlocked. *See id.* at 984-85.

In stark contrast to the facts from *Brazzel*, in this case the jury twice indicated and confirmed it could not reach a verdict—even after an *Allen* charge (*see* 12/20/19 Tr. at 2:2-3, 4:21-6:12; 12/23/19 Tr. at 19:15-20:5); the jury asked multiple questions about how it could reach a partial verdict and was repeatedly instructed to leave the verdict form blank if it could not reach unanimous agreement (*see* 1st Jury Question; 3d Jury Question; 12/20/19 Tr. at 9:21-11:1; 12/23/19 Tr. at 3:22-4:5); one juror told the court she was "being insulted for her views, and she want[ed] it to stop" (*see* 12/23/19 Tr. at 14:15-21); and the court confirmed on the record that the jury was, in fact, "deadlocked" (*see* 12/23/19 Tr. at 19:15-20:5). The Government also promptly moved to retry Mr. Hendrix on all five counts. (*See generally* Not.) As *Jefferson* and *Carothers* confirm, these are exactly the kind of "signs" of hopeless deadlock that were missing in *Brazzel*. *See Jefferson*, 566 F.3d at 935-36; *Carothers*, 630 F.3d at 962-63, 963 n.2.

In fact, many of the facts that the Ninth Circuit focused on as evidence of genuine deadlock in *Jefferson* and *Carothers* are also present here. As in this case, the jury in *Jefferson* twice confirmed it was unable to reach a verdict, continued deliberating after an *Allen* charge, sent the court a question about how to reach a partial verdict, and confirmed on the record that it was deadlocked. *See* 566 F.3d at 932-933. Similarly, in *Carothers*, as in this case, the jury informed the court it was not able to reach unanimous agreement

on all counts, the court instructed the jury to continue deliberating, the jury returned and

confirmed on the record that it was hung, and the court declared a mistrial. *See*

*Carothers*, 630 F.3d at 962-63. Notably, the Ninth Circuit concluded that the *Carothers*

defendant could be retried on the greater offense even though the jury received the same

jury instruction on lesser included offenses that the court gave in this case and the verdict

form in *Carothers* introduced the same inconsistency with the jury instructions that was

present in this case.[8] *See id.* at 962. Thus, *Carothers* provides strong support in

opposition to Mr. Hendrix's argument that the language of the lesser included instruction

and the verdict form given to the jury in this case weighs in favor of finding an implied

acquittal or lack of manifest necessity for a mistrial. (*See* Resp. at 3-4, 7-9 ("The jury

instructions and the verdict form, rather than supporting the government, contradict it.").)

Mr. Hendrix also argues that, even if the court finds that the jury was hopelessly

deadlocked, such that some declaration of a mistrial may have been appropriate, the court

cannot conclude that the jury's deadlock applied to greater offenses of possession with

intent to distribute in Counts 3 and 6. (*See* Resp. at 7-9.) The court has already

considered and rejected Mr. Hendrix's attempts to distinguish between the five greater

offenses. *See supra* § III.C.1. The court's instructions and the jury's actions were

uniform for all five counts charged in the indictment. In response to questions from the

---

[8] The major difference between *Carothers* and this case is that, unlike the trial court in *Carothers*, the court cured any inconsistency between the verdict form and the jury instructions by orally instructing the jury on how to reach a partial verdict in the event that it was unable to reach unanimous agreement. (*See* 12/20/19 Tr. at 9:21-11:1; 12/23/19 Tr. at 3:22-4:5); *see also Carothers*, 630 F.3d at 963 (noting that trial court erred by declaring a mistrial without finding an alternative solution to inadvertent inconsistency in verdict form).

jury regarding partial verdicts, the court instructed the jury to "[c]omplete the portions of the verdict form that you are able to reach unanimous agreement on and do nothing in regards to the ones that you can't reach unanimous agreement on." (*See* 12/20/19 Tr. at 9:24-10:4; 12/23/19 Tr. at 3:22-4:5 ("You do not need to reach a unanimous agreement on each of the counts that is in this action. If you agree on some and you are unable to reach a verdict on others, you can tell me which ones you agree on, and just leave the other ones blank. That's what a partial verdict is.").) Then, after the jury sent out all the signals of deadlock detailed above, the jury informed the court that it had "reached a verdict on two charges" and returned a verdict to the court that had answers to Questions 2B and 4B, but left questions 1, 2, 3, 4, and 5 blank. (*See* Jury Verdict; 12/23/19 Tr. at 19:15-20:5.) The court rejects Mr. Hendrix's attempts to tie the jury's verdict in knots by creating artificial distinctions between the five questions that the jury did not answer.[9] Instead, the court concludes that the jury did not impliedly acquit Mr. Hendrix on any of the counts in the superseding indictment and was instead hopelessly deadlocked on all of the questions that it did not answer in the jury verdict, including the greater offenses in Counts 3 and 6.[10]

//

---

[9] The court also notes that adopting Mr. Hendrix's interpretation that the jury was deadlocked on Count 7 but not on the greater included offense on Count 6 introduces the same logical inconsistency that the court discussed above in rejecting Mr. Hendrix's argument that the court did not declare a mistrial on Counts 3 and 6. *See supra* § III.C.1.

[10] Because the court concludes that the jury did not impliedly acquit Mr. Hendrix on the greater offenses charged in Counts 3 and 6, the court also rejects Mr. Hendrix's argument that portions of Count 4 and all the entirety of Count 7 cannot be retried due to the relationship between those counts and Counts 3 and 6. (*See* Resp. at 9-10; Surreply at 4.)

**D.      Retrial**

Because the court concludes that the court properly declared a mistrial on Count 2, the greater offense charged in Count 3, Count 4, the greater offense charged in Count 6, and Count 7, the Government may retry Mr. Hendrix for each of those offenses without running afoul of the Double Jeopardy Clause. *See, e.g.*, *Richardson*, 468 U.S. at 324 ("[A] retrial following a 'hung jury' does not violate the Double Jeopardy Clause."); *Arizona*, 434 U.S. at 509 ("[W]ithout exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial"). Barring an appeal from Mr. Hendrix that strips the court of jurisdiction, the court intends to try this case as planned on February 3, 2020, as the court informed the parties at the pre-trial conference.[11]  (*See* 1/16/20 Dkt. Entry; 1/24/20 Dkt. Entry.)

The court also notes that Mr. Hendrix filed a motion requesting that, on retrial, the court either (1) inform the jury that Mr. Hendrix was previously convicted of simple possession, or (2) instruct the jury on the lesser included offenses on which the prior jury already convicted Mr. Hendrix.[12]  (Retrial Mot. (Dkt. # 239) at 1.)  The court has

---

[11] It is the court's understanding that if Mr. Hendrix files an appeal of this order—as his counsel indicated he would do at the hearing—that appeal divests the court of jurisdiction. *See United States v. Claiborne*, 727 F.2d 842, 850 (9th Cir. 1984) ("Ordinarily, if a defendant's interlocutory claim is considered immediately appealable under *Abney* [*v. United States*, 431 U.S. 651 (1977)], the district court loses its power to proceed from the time the defendant files its notice of appeal until the appeal is resolved.").  Thus, although the court will not assume that Mr. Hendrix will appeal, if he does so, the court will strike the February 3, 2020, trial date.

[12] The court asked Mr. Hendrix's counsel whether Mr. Hendrix intended to request lesser included offense instructions at his retrial during the pretrial conference and informed Mr. Hendrix that he needed to file a motion requesting lesser included offense instructions if he wanted the court to consider the issue.  (*See* 1/24/19 Dkt. Entry.)

reviewed the motion and concludes that it can rule on the motion without a response from the Government.

The law in the Ninth Circuit appears to be unsettled on the question of how trial courts should treat convictions on lesser included offenses during the retrial of a greater offense following a hung jury on the greater offense. The *Carothers* court concluded that defendants who receive lesser included offense instructions in a first trial are not entitled to the same instructions on retrial of the greater offense because "a defendant who has requested a [lesser included offense] instruction will still have been able to escape an unfair conviction on the greater offense in the first proceeding by having provided doubtful jurors with a lesser included alternative." *See* 630 F.3d at 966. However, because the *Carothers* trial court improperly declared a mistrial on the lesser included offense, the defendant in that case had not been convicted or acquitted of the lesser included offense. *See id.* at 964. Accordingly, the *Carothers* court explicitly stated that it need not weigh in on the question presented here, which is whether or to what extent a defendant is entitled to lesser included offense instructions following a conviction on the lesser included offenses. *See id.* at 966 n.3.

Ultimately, the court rejects both Mr. Hendrix's proposed approaches to the lesser included offenses on retrial. (*See* Retrial Mot. at 1.) Informing the second jury that a first jury convicted Mr. Hendrix of simple possession could unduly influence the second jury's consideration of the evidence on retrial. For example, the second jury might wonder why the first jury did not convict on the greater offenses. The court also concludes that Mr. Hendrix is not entitled to another set of lesser included offense

instructions pursuant to the Ninth Circuit's statements in *Carothers* suggesting that the Circuit is not concerned with the possibility that retrial on greater offenses without lesser included offense instructions "would strip all advantage from the 'unable to agree' instruction." *See id.* at 966. Moreover, as the court noted at oral argument, instructing the jury on charges that Mr. Hendrix has already been convicted on risks inconsistent verdicts.[13] Thus, the court denies Mr. Hendrix's motion and concludes that it will not inform the jury that Mr. Hendrix was previously convicted of simple possession or provide the jury with lesser included offense instructions on retrial.[14]

## IV.   CONCLUSION

For the reasons set forth above, the court DENIES Mr. Hendrix's motion to dismiss (Dkt. # 216) and ORDERS that Mr. Hendrix shall be retried on Count 2, the greater offense of possession of methamphetamine and heroin with intent to distribute charged in Count 3, Count 4, the greater offense of possession of methamphetamine with intent to distribute charged in Count 6, and Count 7 of the superseding indictment on February 3, 2020. The court also DENIES Mr. Hendrix's motion for lesser included offense instructions (Dkt. # 239) and concludes that, on retrial, the court will not inform

---

[13] The court is not convinced that Mr. Hendrix can solve the court's inconsistent verdict issue and force the Government to retry Mr. Hendrix for simple possession by "waiving" his Double Jeopardy rights. (*See* Retrial Mot. at 5-6.) Although the *Carothers* court noted that a defendant may waive a Double Jeopardy defense and stand trial a second time if the defendant would like the second jury to receive lesser included offense instructions, *see Carothers*, 630 F.3d at 966-67, unlike the *Carothers* defendant, Mr. Hendrix does not have a Double Jeopardy *defense* to the simple possession charges because he was convicted of those charges.

[14] Of course, the court's decision not to provide the jury with lesser included offense instructions on retrial does not prevent Mr. Hendrix from arguing at trial that he did not have intent to distribute and is instead guilty only of simple possession.

the jury that Mr. Hendrix was previously convicted of simple possession or instruct the jury on the lesser included offenses of simple possession for Counts 3 or 6.

Dated this 28th day of January, 2020.

JAMES L. ROBART
United States District Judge